Filed 8/21/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B279694 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA133291) |
| v. | |
| ASHLEY DEBRA JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge. Reversed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Ashley Debra Jones appeals from a judgment entered after her conviction following a court trial for second degree murder and child abuse arising from the death of her four-month-old daughter, Savannah.[1] The trial court found true as to the murder count the allegation that Jones personally inflicted great bodily injury on Savannah. Jones was tried with codefendant Johnathan Lucero, Jones's boyfriend and Savannah's father. The trial court found Lucero not guilty of murder but guilty of child abuse.[2] The trial court found as to the child abuse count that both Jones and Lucero willfully caused and permitted Savannah to suffer physical pain and injury under circumstances likely to produce great bodily injury or death.

On appeal, Jones contends her waiver of her right to a jury trial was not knowing, intelligent, and voluntary. We agree. The trial court's two-question inquiry of Jones, as to whether she "underst[ood] [her] right to a jury trial" and whether she agreed to waive that right and have the trial judge "sitting alone, decide the case" does not affirmatively show that Jones understood the nature of the right to a jury trial she was relinquishing. Although there is no rigid formula for what a jury advisement must include, the record does not show whether Jones understood that a jury is

---

[1] The victim's name is spelled both "Savanah" and "Savannah" in the record. We use "Savannah," the spelling used in the reporter's transcript and the parties' appellate briefs.

[2] Lucero is not a party to this appeal. Jones has filed a petition for writ of habeas corpus asserting ineffective assistance of counsel based on, inter alia, her trial counsel's failure to investigate and present evidence to show that Lucero physically abused both Jones and Savannah. Because we reverse Jones's conviction, by a separate order we deny Jones's petition for writ for habeas corpus as moot.

comprised of individuals from the community instead of, for example, a collection of judges.  We reverse on this basis.

We also review the sufficiency of the evidence to determine whether Jones may be tried again for the offenses.  We conclude there was sufficient corroboration of Lucero's accomplice testimony and that substantial evidence supports the convictions.  We remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Information and Jury Waiver*

The information alleged that on December 31, 2013 Jones committed the crimes of murder (Pen. Code,[3] § 187, subd. (a); count 1) and child abuse (§ 273a, subd. (a); count 2).  The information charged Lucero with the same offenses.  The information alleged as to count 1 that in the commission of the offense Jones personally inflicted great bodily injury on Savannah (§ 1203.075, subd. (a)).  The information alleged as to count 2 that Jones and Lucero willfully caused and permitted Savannah to suffer physical pain and injury under circumstances or conditions likely to produce great bodily injury or death (§ 12022.95).

Jones entered a plea of not guilty and denied the special allegations.  On October 13, 2015 Jones and Lucero waived their right to a jury trial.  A court trial commenced as to Jones and Lucero on September 26, 2016.

B.  *The Evidence at Trial*

In December 2013 Jones, Lucero, and their three daughters, four-year-old Amiah, two-year-old Janelle, and four-month-old

---

[3]    Further statutory references are to the Penal Code.

Savannah, shared a bedroom in an apartment in Downey. Lucero's sister Lourdes Cazares and other members of Cazares's family also lived in the apartment.[4] Jones stayed home to care for Savannah. Lucero typically left for work between 1:00 and 1:30 p.m. and returned between 10:30 and 11:00 p.m.

Between 10:00 and 10:30 a.m. on December 31, 2013 Amiah ran into Cazares's room screaming. She looked scared and said her little sister had blood in her eyes. About a minute later, Cazares heard Gloria Aguirre, Jones's grandmother, screaming. Cazares came out of her room and saw Aguirre in the hallway, holding Savannah. Aguirre then sat on the living room couch and rubbed Savannah's chest in a circular motion. Jones was standing in the dining room; Lucero was there, but Cazares could not recall where.

Cazares called 911. The 911 operator told her to place Savannah on the floor and check for a pulse. Cazares did this, but was unable to find a pulse. Savannah was cold to the touch. Cazares saw bruises "just popping up on her."

Downey Police Officer Blanca Reyes arrived at Cazares's apartment at 10:25 a.m. Downey Police Officer Angel Villegas arrived a few minutes later. Officer Reyes found Savannah lying on the living room floor, wrapped in a blanket. Savannah had two circular bruises on her forehead. Her skin was pale; her eyes were open and had a glossy film over them. She was not breathing. Officers Reyes and Villegas performed CPR on Savannah. Jones then walked into the living room from the hallway and said that

---

[4] Cazares and the responding police officers testified to the events of December 30 and 31, 2013. Neither Jones nor Lucero testified or called any witnesses.

4

she had just woken up.  Officer Villegas yelled at her, "Who was watching the baby?"  Jones did not respond.

The paramedics took Savannah to the hospital.  Officer Reyes followed, and spoke to Jones and Aguirre at the hospital.  Jones told Officer Reyes that Savannah had been constipated.  Savannah had a bowel movement about midnight; Jones changed her diaper and put her back to sleep.  Savannah awoke later and was crying.  Jones gave her a pacifier, and Savannah went back to sleep.  Jones woke up about 10:00 a.m.  She took Savannah from the co-sleeper on the floor and put her on the bed.  Jones noticed that Savannah's eyes were open and she was nonresponsive.  Jones called Aguirre because she believed something was wrong with Savannah.  Officer Reyes asked Jones about her feeding of Savannah.  Jones said she did not breastfeed Savannah, and instead gave her a soy milk formula with iron.

Denise Bertone, coroner investigator with the County of Los Angeles Department of Medical Examiner-Coroner, examined Savannah at the hospital.  Bertone observed multiple injuries, including a small bruise under Savannah's jaw, bruises on her head, chest, hip, legs, and ribs, and discoloration of her abdomen.  Savannah was also underweight.  Bertone observed and was able to feel a "callous formation" bump on Savannah's rib, indicating that Savannah had a fractured rib that was healing.

In response to Bertone's questions, Jones stated that Savannah had no known history of any medical problems.  Jones "volunteered that . . . she is careful, she is always with the baby and keeps the siblings away from the child."  Jones admitted Savannah had some bruises, but added that "they quickly went away."  Because Savannah was underweight, Bertone also inquired about her feeding schedule.  Jones responded that she fed Savannah every three hours with a soy-based formula.  Jones last

fed her on December 30 between 11 and 11:30 p.m. Savannah did not have difficulty feeding.

Dr. James Ribe, a senior deputy medical examiner with the County of Los Angeles Department of Medical Examiner-Coroner, supervised Savannah's autopsy. He concluded Savannah's death was caused by blunt force trauma from blows to Savannah's abdomen and body, which caused fatal internal injuries, with a contributing cause of malnutrition. He noted that Savannah was emaciated and had, among other injuries, bruises on her forehead, face, chin, chest, abdomen, back, and knees. The autopsy revealed multiple contusions caused by blows to the head, two skull fractures, and contusions on her pancreas, lungs, and diaphragm. There was "advanced healing" of a fracture to the left side of Savannah's skull, consistent with the injury having healed for a period of weeks. Dr. Ribe found "early healing" of a fracture to the right side of the skull, meaning the fracture had healed for a period of days before Savannah's death.

Dr. Ribe opined that Savannah's injuries were caused by an adult striking the baby and could not have been caused accidentally. Savannah's malnutrition would have weakened her ability to heal and survive her injuries. A sample from Savannah's blood was analyzed, and the toxicology report showed she had been exposed to methamphetamine prior to her death.

Dr. Sandra Murray, a pediatrician specializing in child abuse pediatrics, also opined that Savannah's injuries were not accidental. She testified that Savannah weighed 9 pounds, 12 ounces at the time of the autopsy and that Savannah had lost weight during the six weeks before her death. Dr. Murray opined that the failure to take Savannah to a doctor to address her weight loss contributed to her death.

Downey Police Homicide Detective Steven Aubuchon interviewed Jones at the hospital. Jones said that on the evening of December 30 she was in her room with Lucero and Savannah.[5] When Jones woke up the next morning about 10:30 a.m., Savannah was cold to the touch. Jones picked her up and listened for a heartbeat, but did not hear one. Jones yelled for Lucero. Lucero also checked for a heartbeat and told Jones to call 911. Jones called Aguirre instead. When Aguirre arrived, she said there was something wrong with Savannah, and told Jones to call 911. However, it was Cazares who called 911. Jones told Detective Aubuchon she did not call 911 because she was confused and scared and had not gone through this before.

Jones told Detective Aubuchon that she was Savannah's primary caregiver and that Savannah had "not been out of her sight for more than 20 minutes at a time." Jones said she fed Savannah with soy milk formula every two hours. She saw the bruising on Savannah's hip and abdomen for the first time the morning of December 30 while she was changing Savannah's diaper. Jones saw Savannah naked on December 29 while Lucero gave her a bath, but Jones did not see bruising on Savannah at that time. Jones denied knowing how the bruises got there. At the end of the interview, Jones was allowed to leave.

After the autopsy on January 1, 2014, Jones and Lucero were arrested. Detective Aubuchon then interviewed Jones and

---

[5] Jones initially told Detective Aubuchon that she was in her room with Lucero and all three daughters, but later told him that Amiah and Janelle were at Aguirre's home, not with Jones. Jones also had told Officer Reyes that Lucero was at work the morning of December 31, which was contradicted by her later statement to Detective Aubuchon and Cazares's testimony.

Lucero, after reading each of them their *Miranda*[6] rights. Lucero stated that when he arrived home about 10:30 p.m. on December 30, he heard Savannah "breathing funny." He woke up about 10:00 a.m. the following morning when he heard Jones yelling that there was something wrong with Savannah. He checked Savannah for a heartbeat and could not hear one. He told Jones, "I'm not responsible for this bullshit."

Lucero told Detective Aubuchon he saw a bruise on Savannah's abdomen on December 29 when he was bathing her. He asked her, "What is this? Take her to the doctor." He said to Jones, "What the fuck?" In response to his inquiry about the bruise, Jones said Savannah had been constipated, so she was giving her suppositories and massaging her stomach. Lucero had purchased suppositories to help Savannah with the constipation. But at some point when Savannah requested more suppositories, Lucero told her, "No, I'm not getting any more suppositories. Take the baby to the damn doctor."

Lucero had observed Savannah was underweight and blamed it on Jones for not taking her to the doctor. It was Jones's responsibility to take Savannah to the doctor because he was always at work. Lucero said Jones was overwhelmed with the children, so Amiah and Janelle would frequently stay at Aguirre's home. After Savannah was born, Jones would often become angry and aggressive and cursed at Amiah and Janelle for no apparent reason.

---

[6]     Under *Miranda v. Arizona* (1966) 384 U.S. 436, law enforcement officers must advise a suspect before a custodial interrogation of his or her right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.

8

Lucero also "saw that Savannah's head was kind of big, and when he touched [her] head, it felt kind of squishy around the— the opening." He could feel her brain through the opening. Lucero stated that he had no doubt that Jones "would have done this," because Jones did not take Savannah to the doctor. However, this statement was admitted as to Lucero only.

## C. *The Trial Court's Ruling and Sentencing*

The trial court found Jones guilty of second degree murder based on implied malice as alleged in count 1 and child abuse as alleged in count 2. As to count 1 the court found the allegation true that Jones personally inflicted great bodily injury on Savannah. As to count 2 the court found the allegation true that Jones willfully caused and permitted Savannah to suffer physical pain and injury under circumstances likely to produce great bodily injury or death (§ 12022.95).

The court sentenced Jones to 15 years to life on count 1, second degree murder. On count 2, child abuse, the trial court imposed and stayed a 10-year term (the upper term of six years plus four years for the sentencing enhancement) pursuant to section 654. Jones timely appealed.

## DISCUSSION

### A. *Jones Did Not Provide a Knowing and Intelligent Waiver of Her Right to a Jury Trial*

#### 1. *Proceedings below*

Prior to trial, Jones and Lucero waived their rights to a jury trial. The prosecutor took their waivers as follows:

"[Prosecutor]: Ms. Jones, Mr. Lucero, your attorneys have indicated that you wish to waive jury and have this case decided

9

by Judge Sahagun sitting alone. In order to do that, you each have to waive your right to a jury trial. Ms. Jones, do you understand your right to a jury trial?

"Defendant Jones: Yes, sir.

"[Prosecutor]: Do you agree to waive that right and have Judge Sahagun, sitting alone, decide the case?

"Defendant Jones: Yes, sir.

"[Prosecutor]: Mr. Lucero, do you also understand your right to a jury trial?

"Defendant Lucero: Yeah.

"[Prosecutor]: Do you agree to waive that right and agree that Judge Sahagun, sitting alone, would make the decision on this case?

"Defendant Lucero: Yes."

The attorneys for both Jones and Lucero joined in the waiver.

> 2. *A defendant's waiver of the right to a jury trial*

A defendant in a criminal prosecution has a right to a trial by jury under both the federal and state Constitutions. (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*); *People v. Cunningham* (2015) 61 Cal.4th 609, 636 (*Cunningham*).) "Although trial by jury is a fundamental constitutional right, a criminal defendant may waive the right." (*Cunningham*, at p. 636; accord, *Sivongxxay*, at p. 166.) However, "'a defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent, that is, ""made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,""' as well as voluntary ""'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.""""

10

(*Sivongxxay*, at p. 166; accord, *Cunningham*, at pp. 636-637.) The denial of a defendant's constitutional right to a jury trial constitutes structural error that requires reversal regardless of the strength of the evidence supporting the conviction. (*People v. French* (2008) 43 Cal.4th 36, 52, fn. 8; *People v. Collins* (2001) 26 Cal.4th 297, 311.)

"'[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case.'" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 166.) However, the courts have "not mandated any specific method for determining whether a defendant has made a knowing and intelligent waiver of a jury trial in favor of a bench trial. We instead examine the totality of the circumstances." (*Id.* at p. 167.) However, a jury waiver is only valid "''if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances.'''" (*People v. Daniels* (2017) 3 Cal.5th 961, 991 (*Daniels*) (lead opn. of Cuéllar, J.); accord, *id.* at p. 1018 (conc. & dis. opn. of Corrigan, J.; *People v. Collins*, *supra*, 26 Cal.4th at p. 310.)

The Supreme Court in *Sivongxxay* provided "general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent, and to facilitate the resolution of a challenge to a jury waiver on appeal." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) Although the Court made clear its guidance was "not intended to limit trial courts to a narrow or rigid colloquy" (*id.* at p. 170), the Supreme Court advised: "Going forward, we recommend that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must

11

unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence. We also recommend that the trial judge take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails. A trial judge may do so in any number of ways—among them, by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived. Ultimately, a court must consider the defendant's individual circumstances and exercise judgment in deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently." (*Id*. at pp. 169-170.)

In *Sivongxxay*, the Supreme Court concluded the defendant's waiver of his right to a jury trial was knowing and intelligent where the trial court had advised him "that he had a right to a jury trial, that a jury consists of 12 people from the community, that he would have the right to participate in the selection of the jury, and that waiver of the right to a jury would mean the judge alone would determine his guilt or innocence and any resulting punishment." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167.) The Court also found significant that the defendant had pleaded guilty to two prior offenses in which he signed a waiver stating that he fully understood his right to a jury trial. (*Ibid*.) The Court concluded, "Viewed holistically, the circumstances surrounding defendant's jury waiver demonstrate that it was knowing and intelligent." (*Id*. at p. 168.)

12

The Court rejected the defendant's argument that the jury waiver was deficient because the trial court failed to advise him that the jury must be impartial and render a unanimous verdict, explaining, "'[T]he United States Supreme Court has never held that a defendant, when waiving the right to a jury, constitutionally is entitled to be canvassed by the trial court, let alone to require a specifically formulated canvass' [citations], and we have never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 168, fn. omitted; accord, *Daniels*, *supra*, 3 Cal.5th at pp. 992-993 (lead opn. of Cuéllar, J. ["We continue to eschew any rigid rubric for trial courts to follow in order to decide whether to accept a defendant's relinquishment of this right."]; *id.* at p. 1018 (conc. & dis. opn. of Corrigan, J.) ["We have consistently eschewed any rigid formula or particular form of words that a trial court must use to ensure that a jury trial waiver is knowing and intelligent."].)

The Supreme Court and Courts of Appeal have consistently concluded that the failure of a trial court to provide a specific advisement does not mean there was not a knowing, intelligent, and voluntary waiver. (See, e.g., *People v. Weaver* (2012) 53 Cal.4th 1056, 1072-1073 (*Weaver*) [jury trial waiver upheld where defendant was informed he had a right to the unanimous verdict of 12 jurors and his attorney had fully explained the difference between a jury and a court trial, but he was not advised of his right to participate in selection of the jury]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1105 (*Wrest*) [jury trial waiver upheld where defendant was advised that a jury of 12 citizens selected by the court and his counsel would need to render a unanimous verdict to find him guilty, but rejecting argument that the trial court was

13

required to ensure defendant understood "'all the ins and outs' of a jury trial in order to waive his right to one"]; *People v. Doyle* (2016) 19 Cal.App.5th 946, 952 (*Doyle*) [upholding jury trial waiver where defendant discussed his rights with his attorney and was advised that the burden of proof of beyond a reasonable doubt, the right to subpoena witnesses, the right to testify on his own behalf or remain silent, and the right to cross-examine witnesses would apply equally to a jury or court trial, even though the trial court failed to advise defendant he was entitled to a unanimous verdict by 12 jurors]; see also *U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, 1181 (*DeRobertis*) [upholding jury trial waiver where defendant was advised he was giving up his right to have 12 members of a jury decide his case, but not of his right to a verdict of a "substantial majority" of jurors or that he could participate in jury selection]; cf. *People v. Blancett* (2017) 15 Cal.App.5th 1200, 1206-1207 (*Blancett*) [concluding defendant's jury trial waiver after trial court's "stark colloquy" in which defendant only stated he was "okay" with having the trial court decide his case was not knowing and intelligent].)

Notably, in *Sivongxxay*, *Weaver*, *Wrest*, and *DeRobertis*, the trial courts inquired extensively of the defendants before accepting their jury trial waivers, specifically advising them that they would be giving up the right to have their case decided by 12 members of a jury drawn from the community or comprised of citizens. The trial court in *Doyle* did not advise the defendant of the fact a jury is drawn from the community, but did advise him that his other trial rights applied equally to a jury or court trial.

The Supreme Court addressed the requirements for a knowing and intelligent jury trial waiver most recently in *Daniels*. The Court concluded the defendant David Daniels, who represented himself, had provided a knowing and intelligent

14

waiver of his right to a jury trial in a death penalty case as to his guilt and determination of the special circumstances allegation where "the trial court informed [the defendant] that he had a right to be tried by a jury made up of members of the community and that, if he waived jury trial, the court alone would determine the issues of guilt, special circumstances, and penalty." (*Daniels*, *supra*, 3 Cal.5th at p. 1011 (con. & dis. opn. of Corrigan, J.).)[7] As

---

[7] Justice Cuéllar authored the lead opinion, in which all seven justices agreed on its resolution of all issues except as to Daniels's jury trial waiver. Two justices joined in part II.D of the lead opinion, which concluded that Daniels's waiver was invalid as to all three phases of the trial. Justice Corrigan authored a concurring and dissenting opinion, joined by two justices, in which she concluded Daniels made a knowing and intelligent waiver of his right to a jury trial as to all three phrases of the trial. (*Daniels*, *supra*, 3 Cal.5th at p. 1010.) Justice Kruger cast the fourth vote, concurring in the judgment affirming the conviction as to the first two phases of the trial and agreeing with Justice Corrigan's conclusion that Daniels had waived his right to a jury trial as to these phases because he did so "'with eyes open.'" (*Id.* at p. 1029 (conc. & dis. opn. of Kruger, J.).) However, Justice Kruger raised a concern that "[t]he court never asked defendant whether he understood the alternative before him—that is, the nature of the jury right he was waiving." (*Id.* at p. 1029.) Justice Kruger concurred in the lead opinion's conclusion as to the penalty phase that Daniels had not made a knowing waiver of his right to a jury trial. (*Id.* at p. 1004 (lead opn. of Cuéllar, J.) ["The record is even more bereft of support for the conclusion that Daniels's penalty phase waiver was valid."]; *id.* at p. 1030 (conc. & dis. opn. of Kruger, J.) [the record did not show "that information about the fundamental attributes of a jury trial would have been irrelevant to, or merely confirmatory of, defendant's choice to waive a penalty phase jury"].)

15

part of its 15-question inquiry, the trial court asked Daniels multiple times whether he understood what the court was telling him about his "'right to proceed by way of jury trial or by way of court trial,'" asked him, "'Do you know what you have just done,'" and confirmed Daniels had not been threatened or coerced to waive his rights. Daniels consistently confirmed he understood what the trial court was telling him and knew what he was doing. (*Id*. at pp. 986-989 (lead opn. of Cuéllar, J.; *id*. at pp. 1013-1015 (conc. & dis. opn. of Corrigan, J.).)

Justice Corrigan concluded in her concurrence, citing to the United States Supreme Court's holding in *Williams v. Florida* (1970) 399 U.S. 78, 100, that Daniels "was advised that he had a right to be tried by a jury drawn from members of the community, and that if he waived jury trial, the court alone would determine the issues of guilt, special circumstances, and penalty. This is the essence of the jury trial right. 'The purpose of the jury trial . . . is to prevent oppression by the Government. "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." [Citation.] Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.'" (*Daniels*, *supra*, 3 Cal.5th at p. 1019, fn. omitted (conc. & dis. opn. of Corrigan, J.).)

Justice Corrigan's concurrence cited approvingly to the Seventh Circuit decision in *DeRobertis*, in which the court "upheld a jury trial waiver as knowing and intelligent where the defendant 'understood that the choice confronting him was, on the one hand,

16

to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.'" (*Daniels*, *supra*, 3 Cal.5th at p. 1020 (conc. & dis. opn. of Corrigan, J.); see *Sivongxxay*, *supra*, 3 Cal.5th at p. 168 [citing *DeRobertis*].)[8] The concurrence noted that "Daniels, too, was told these basic facts on three separate occasions during the trial, and said that he understood them no fewer than 15 times. At one point Daniels declared, 'Your Honor, I respect and thank you for being concerned, that you are the Judge James L. Long, and I trust and have faith in you, whatever your decision is.' This record amply demonstrates that Daniels understood the choice he was making: whether 'he trusts the judgment of his fellow citizens with his fate, or if he would rather entrust it to the judgment of a solitary state judicial officer.'" (*Daniels*, at pp. 1020-1021.)

The concurring opinion also looked at Daniels's conduct in the case after his jury waiver, including that he pleaded guilty to all allowable charges and presented no defense or argument at the guilt or penalty phase of the trial on the remaining charges. (*Daniels*, *supra*, 3 Cal.5th at p. 1023 (conc. & dis. opn. of Corrigan, J.).) The Court observed, "He later explained to the probation officer that he chose this course for reasons that were significant to him. He wanted closure, and 'felt it would be unfair to the victims and their surviving family members for him to attempt to fight these charges, knowing he was guilty of each of the crimes.' The record shows Daniels had been considering his approach to the

---

8       The lead opinion distinguished *DeRobertis* on the basis that in contrast to Daniels, the defendant in *DeRobertis* "'was represented by competent counsel.'" (*Daniels*, *supra*, 3 Cal.5th at pp. 998-999, italics omitted (lead opn. of Cuéllar, J.).) That distinction is not at issue here.

17

case for several months and had discussed his wishes with counsel. . . . [Citations.] Given Daniels's expressed desire to be convicted and punished, it strains credulity to suggest that his jury trial waiver would have been materially more informed had he been given more detail." (*Id*. at pp. 1022-1023; see *id*. at p. 1029 (conc. & dis. opn. of Kruger, J.) ["My agreement [that Daniels had his 'eyes open' in waiving his jury trial right] rests primarily on the indications in the record that defendant's overarching aim throughout the proceedings was simply to accept responsibility for the charged crimes. [Citation.] His choice to waive his right to jury trial on the substantive charges was of a piece with his general approach to the trial on guilt that he did not want in the first place."].)[9]

In *Blancett,* the only published jury waiver case following the Supreme Court's decisions in *Sivongxxay* and *Daniels*, our colleagues in Division Six considered whether the defendant in a mentally disordered offender recommitment hearing made a knowing, intelligent, and voluntary waiver of his right to a jury trial where, as the trial court noted, the defendant's attorney had represented that the defendant was "'okay with having a judge decide [his] case and not a jury.'" The trial court then inquired

---

[9] The concurring opinion also found significant that the defendant had approximately 10 years earlier pleaded guilty in three cases in which he was advised that he was entitled to a unanimous verdict of 12 jurors. (*Daniels*, *supra*, 3 Cal.5th at pp. 1011-1012 (conc. & dis. opn. of Corrigan, J.).) The lead opinion gave less weight to Daniels's prior advisements, explaining, "we find only an attenuated connection, at best, between Daniels's jury trial right waivers in this capital case and the oral advice Daniels received in connection with guilty pleas a decade earlier." (*Id*. at p. 1002 (lead opn. of Cuéllar, J.).)

18

simply, "'That's okay with you?'" The defendant responded, "'Yes, your honor.'" (*Blancett*, *supra*, 15 Cal.App.5th at p. 1203.)

The Court of Appeal concluded the defendant "did not waive his right to a jury trial with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Blancett*, *supra*, 15 Cal.App.5th at p. 1206.) Specifically, the trial court did not advise the defendant of his right to a jury trial or "explain the significant attributes or mechanics of a jury trial. [Citation.] Neither did the court inquire whether [the defendant] had sufficient opportunity to discuss the decision with his attorney, whether his attorney explained the differences between a bench trial and a jury trial, or whether [the defendant] had any questions about the waiver." (*Ibid*.) Further, the defendant had not previously been involved in a similar proceeding and the record did not show he was aware he was entitled to a jury trial. (*Ibid*.)

The Court of Appeal explained, "In view of the trial court's stark colloquy, the lack of evidence that [the defendant] discussed his jury trial right and waiver with counsel, [the defendant's] inexperience with the criminal justice system, and [the defendant's] lack of familiarity with [the type of] proceedings, we conclude that his waiver was not knowing and intelligent." (*Blancett*, *supra*, 15 Cal.App.5th at pp. 1206-1207;[10] see *U.S. v.*

---

[10] The People cite to the holding in *People v. Acosta* (1971) 18 Cal.App.3d 895 to support their argument that Jones's jury waiver was adequate. In *Acosta*, the trial court advised the defendant that he was entitled to a jury trial and inquired whether he "'desire[d] to waive the jury and have [his] case heard by a judge without a jury.'" (*Id*. at p. 901.) The Court of Appeal rejected the defendant's argument that his waiver was not knowing and intelligent because he did not know what a jury was or what the

*Delgado* (7th Cir. 1981) 635 F.2d 889, 890 [concluding jury waiver was not adequate where the record did not show that the defendant understood his right to a jury trial and understood the consequences of the waiver, instead responding only that he signed a written waiver and voluntarily gave up his right to a trial by jury on the advice of his attorney].)[11]

3. *The record does not affirmatively show that Jones provided a knowing, intelligent, and voluntary waiver of her right to a jury trial.*

Jones contends she did not give a knowing, intelligent, and voluntary waiver because the trial court did not advise her that in a jury trial, 12 members of a jury would decide her case, the jurors would need to be unanimous to render a verdict, she could assist with the selection of the jury, and the same standard of proof of

---

waiver of a jury trial meant, observing, "[a]s far as the record is concerned, there is nothing to indicate that defendant did not understand his right to a jury trial, or that he did not knowingly waive that right . . . ." (*Ibid.*) To the extent the court in *Acosta* was shifting the burden to the defendant to show that his waiver was *not* knowing and voluntary, it is contrary to the Supreme Court's recent holding in *Daniels* that "'the record [must] *affirmatively* show[] that [the waiver] is voluntary and intelligent under the totality of the circumstances.'" (*Daniels, supra*, 3 Cal.5th at p. 991 (lead opn. of Cuéllar, J.); see *id.* at p. 1018 (conc. & dis. opn. of Corrigan, J.).)

[11]    The holding in *U.S. v. Delgado* is cited approvingly by the court in *Sivongxxay* for its conclusion that the trial court "'should'" explain to a defendant that the jury is comprised of 12 members of the community, the defendant can participate in selection of the jury, and the verdict of the jury must be unanimous. (*Sivongxxay, supra*, 3 Cal.5th at p. 169.)

beyond a reasonable doubt would apply. She also argues she did not make a knowing waiver because she was not advised that the trial court would hear her codefendant Lucero's statements that incriminated her, whereas in a jury trial the jury would not.[12]

The record shows that Jones had some discussion with her attorney before the waiver was taken in that it was her attorney who indicated to the trial court that Jones wanted to waive her right to a jury trial. However, the record does not show whether Jones's attorney ever discussed with her the nature of a jury trial, including for example, that the jury would be comprised of 12 of

---

[12] Under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123, a "nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible at a joint trial." (*People v. Penunuri* (2018) 5 Cal.5th 126, 154.) Although Jones is correct that the trial court heard the potentially incriminating statements made by Lucero, the trial court ruled the statements were admitted only as to Lucero. "We presume the trial court's training and experience enabled it to confine its consideration of [inadmissible] evidence to the case in which it was properly admitted." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1175.) Because we conclude the record does not show that Jones's waiver was knowing and intelligent, we need not reach whether a defendant's lack of knowledge about this type of a consequence should be considered as part of the totality of the circumstances affecting the validity of a jury trial waiver. We likewise do not consider Jones's argument that her trial counsel improperly assured her that "the only way she had any possibility of a defense and fair trial was to forego her right to a jury trial." This argument goes beyond the record, and therefore we do not consider it in our analysis. (*People v. Hannon* (2016) 5 Cal.App.5th 94, 104 ["it is well established that on appeal we generally consider only evidence presented to the court below"].)

21

her peers from the community.  Further, the trial court did not specifically advise Jones that she had a right to a jury trial, instead only asking her, "do you understand your right to a jury trial?"  She responded, "Yes, sir."  The only real advisement by the trial court was that, as a result of Jones's waiver, the trial judge "sitting alone" would "decide the case."  Jones agreed, again responding, "Yes, sir."

The question before us is whether this sparse record """*affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances."""  (*Daniels*, *supra*, 3 Cal.5th at p. 991 (lead opn. of Cuéllar, J.); see *id*. at p. 1018 (conc. & dis. opn. of Corrigan, J.).)  It does not.  There is no showing from this record that Jones understood the nature of the right to a jury trial she was relinquishing.  While the Supreme Court in *Sivongxxay* made clear there is no precise formulation for a valid jury waiver advisement, the Court recommended that the trial court advise the defendant that in a trial by jury, the jury is comprised of 12 members of the community, the defendant through his or her attorney may participate in jury selection, 12 jurors must unanimously agree to render a verdict, and in a court trial, the judge alone will decide the defendant's guilt or innocence. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.)  Of this list, the trial court here only advised Jones that it alone would decide whether Jones was guilty or innocent.

Neither did the trial court take steps to ensure Jones "comprehend[ed] what the jury trial right entails." (*Sivongxxay*, *supra*, 3 Cal.5th at pp. 169-170.)  The trial court did not inquire whether Jones understood the nature of her right to a jury trial, whether she discussed her decision with her attorney, or whether she had any questions.  While the trial court's inquiry need not be a specific "narrow or rigid colloquy," the record must show that the

22

waiver was knowing, intelligent, and voluntary.  (*Id*. at p. 170.)
Because the trial court did not advise Jones as to the specific
rights she would be giving up or inquire if her attorney explained
those rights to her, her bare acknowledgment that she understood
her right to a jury trial was inadequate.

Significantly, although the Supreme Court in *Sivongxxay*
and *Daniels* concluded it was not necessary that the defendant be
advised specifically that the jury is comprised of 12 jurors, the
Court has consistently emphasized the importance of the
defendant's knowledge that he or she has """the right to be tried by
a jury of his [or her] peers.""" (*Daniels*, *supra*, 3 Cal.5th at p. 1019
(conc. & dis. opn. of Corrigan, J.) [rejecting challenge to jury
waiver, noting that "Daniels was advised that he had a right to be
tried by a jury drawn from members of the community"]; accord,
*id*. at p. 994 (lead opn. of Cuéllar, J.) [trial court should explain
"what constitutes a jury"]; *Sivongxxay*, *supra*, 3 Cal.5th at pp. 167-
168 ["the presence or absence of a reference in a colloquy to [a
requirement of unanimity among 12 jurors for a guilty verdict] is
not necessarily determinative of whether a waiver meets
constitutional standards," but noting that the trial court advised
the defendant "that a jury consists of 12 people from the
community"]; see *DeRobertis*, *supra*, 715 F.2d at p. 1180
[defendant "understood that the choice confronting him was, on
the one hand, to be judged by a group of people from the
community, and on the other hand, to have his guilt or innocence
determined by a judge"].)

Nothing in the record suggests that Jones was aware that a
jury is comprised of individuals drawn from the community.
Moreover, unlike the defendants in *Sivongxxay* and *Daniels*, who
had previously waived their rights in connection with guilty pleas
(see *Daniels*, *supra*, 3 Cal.5th at pp. 1011-1012 (conc. & dis. opn. of

Corrigan, J.); *Sivongxxay*, *supra*, 3 Cal.5th at p. 167), Jones had no experience with the criminal justice system. Neither the information nor the probation report reveals a prior criminal charge.

Rather, this case is more similar to *Blancett*, in which the trial court's entire inquiry was whether the defendant was "okay" with having his case decided by a judge instead of a jury. The additional statement by Jones that she understood her right to a jury trial does not change the fact that, as in *Blancett*, Jones "did not waive [her] right to a jury trial with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Blancett*, *supra*, 15 Cal.App.5th at p. 1206.)

We conclude the record does not ""*affirmatively* show[] that [Jones's jury waiver was] voluntary and intelligent under the totality of the circumstances."" (*Daniels*, *supra*, 3 Cal.5th at p. 991 (*Daniels*) (lead opn. of Cuéllar, J.); see *id*. at p. 1018 (conc. & dis. opn. of Corrigan, J.).)

Although we conclude that Jones's convictions must be reversed because of the lack of a valid waiver of her right to a jury trial, we also must consider the sufficiency of the evidence to determine whether she may be tried again on the charges. (*People v. Morgan* (2007) 42 Cal.4th 593, 613 ["Although we have concluded that the kidnapping conviction must be reversed because it was presented to the jury on both a legally adequate and a legally inadequate theory, we must nonetheless assess the sufficiency of the evidence to determine whether defendant may again be tried for the kidnapping offense."]; *People v. Hayes* (1990) 52 Cal.3d 577, 631 ["Although we have concluded that the robbery conviction must be reversed for instructional error, we must nonetheless assess the sufficiency of the evidence to determine

24

whether defendant may again be tried for this offense."]; see *People v. Story* (2009) 45 Cal.4th 1282, 1295 ["'an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial'"].)

B.     *Sufficient Evidence Corroborated Lucero's Accomplice Testimony*

1.     *Accomplice testimony must be corroborated.*

Jones contends there was insufficient evidence to corroborate the accomplice testimony of Lucero. Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Under section 1111, an accomplice is "defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." The People concede that Lucero was an accomplice because he was charged with the identical offenses as Jones.

Further, Lucero's statements to Detective Aubuchon constituted "testimony" for purposes of section 1111. "'"[T]estimony" within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.'" (*People v. Williams* (1997)

25

16 Cal.4th 153, 245; accord, *People v. Jeffery* (1995) 37 Cal.App.4th 209, 211.)

Section 1111 "reflects the Legislature's determination that "'because of the reliability questions posed by'" accomplice testimony, such testimony "'by itself is insufficient as a matter of law to support a conviction.'"" (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128; accord, *People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) "The requirement that accomplice testimony be corroborated is an "'exception[]" to the substantial evidence' rule. [Citation.] . . . [Citations.] Section 1111 does not affect the admissibility of accomplice testimony but rather 'reflects a legislative determination of how accomplice testimony must be treated.'" (*Romero and Self*, at p. 32; accord, *People v. Najera* (2008) 43 Cal.4th 1132, 1137.)

As the Supreme Court explained in *People v. Najera*, "[A]ccomplice testimony requires corroboration not because such evidence is factually insufficient to permit a reasonable trier of fact to find the accused guilty beyond a reasonable doubt, but because '[t]he Legislature has determined that because of the reliability questions posed by certain categories of evidence, evidence in those categories by itself is insufficient as a matter of law to support a conviction.' [Citations.] That is, even though accomplice testimony would qualify as 'substantial evidence' to sustain a conviction . . . [citation], the Legislature has for policy reasons created an 'exception[]' to the substantial evidence test and requires accomplice testimony to be corroborated." (*People v. Najera, supra*, 43 Cal.4th at pp. 1136-1137.)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of

the crime.'" (*Romero and Self*, *supra*, 62 Cal.4th at pp. 32-33; accord, *People v. McDermott* (2002) 28 Cal.4th 946, 985; *People v. Szeto* (1981) 29 Cal.3d 20, 26-27 [upholding jury's "implied finding" that accomplice testimony was sufficiently corroborated because the corroborating evidence was properly admitted and "did reasonably tend to connect defendant with the crimes"].)

Section 1111 "require[s] 'evidence tending to connect defendant with the crimes "without aid or assistance from the testimony of"' the accomplice. [Citation.] . . . [E]vidence corroborating accomplice testimony '"need not . . ." [citation] . . . corroborate every fact to which the accomplice testifies [citation], and '"may be circumstantial or slight and entitled to little consideration when standing alone."'" [Citation.] But the evidence must nonetheless connect the defendant to the crime itself, rather than simply connect the accomplice to the crime." (*People v. Perez* (2018) 4 Cal.5th 421, 452; *id.* at pp. 428-429, 453 [sufficient evidence connected defendant to the crime, including witness testimony placing defendant near the murder location and describing his efforts to sell stolen jewelry, as well as evidence that the victim's vehicle was abandoned near the motel where defendant and his accomplices checked in after the killing]; accord, *People v. Rodriguez*, *supra*, 4 Cal.5th at p. 1128 [corroborating evidence was not sufficient to connect defendant to commission of the crime where Attorney General conceded the evidence was insufficient and the only evidence against defendant was that he was a member of the gang responsible for the murder]; *Romero and Self*, *supra*, 62 Cal.4th at pp. 32-36 [corroborating evidence sufficient as to crimes committed by defendant Self with shotgun where Self admitted he owned a shotgun and purchased shotgun shells, shotgun wadding was found in the victim's car, and Self committed a similar crime a month later; evidence was insufficient

as to robbery where evidence showed codefendant was holding the shotgun]; *People v. Valdez* (2012) 55 Cal.4th 82, 147-148 [corroborating evidence was sufficient, including ballistics evidence connecting defendant to the murder, witness testimony that defendant exited a vehicle before gunshots were fired, and that defendant was a member of the gang responsible for the murder, because "'it tend[ed] to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice [was] telling the truth'"].)

"'"The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration."'" (*People v. Rodriguez, supra*, 4 Cal.5th at p. 1128.) A defendant's own conduct or statements may provide adequate corroboration for accomplice testimony. (*People v. Williams, supra,*16 Cal.4th at p. 680; accord, *People v. Mohamed* (2016) 247 Cal.App.4th 152, 163 ["a defendant's own testimony and the reasonable inferences therefrom may supply the necessary corroboration for an accomplice's testimony"]; see *People v. Hartsch* (2010) 49 Cal.4th 472, 499 ["Defendant's own statements to the police mirrored [the accomplice's] description of the events leading to the shootings."].) "False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence." (*People v. Santo* (1954) 43 Cal.2d 319, 327; accord, *In re B.D.* (2007) 156 Cal.App.4th 975, 985.)

2. *Jones's own conduct and statements provided sufficient corroboration of Lucero's testimony.*

Jones contends there was insufficient corroboration of Lucero's statements to Detective Aubuchon. The trial court considered Lucero's statements that when he arrived home the

28

night before Savannah's death she was "breathing funny"; he woke the next morning to Jones yelling that something was wrong with Savannah; he told Jones, "I'm not responsible for this bullshit"; he saw a bruise on Savannah on December 29 when he bathed her; Jones told him in response to his questions about the bruises that Savannah was constipated; Savannah's nutrition was Jones's responsibility; and he urged Jones to take Savannah to the doctor, but she refused.[13] We review the evidence without considering Lucero's testimony to determine whether the evidence standing alone connects Jones to commission of the crime. (*People v. Perez*, *supra*, 4 Cal.5th at pp. 452-453; *People v. Rodriguez*, *supra*, 4 Cal.5th at p. 1128.) We conclude that it does.

As the trial court found, Jones "acted in a fashion which [the court] thought showed consciousness of guilt. She was evasive to the police, she didn't call 911." Jones told Officer Reyes and Detective Aubuchon that on the day of Savannah's death, Jones woke up about 10:00 a.m. or 10:30 a.m.[14] and saw that Savannah was nonresponsive and cold to the touch, with no apparent heartbeat. Yet Jones called Aguirre instead of 911. Both Aguirre and Lucero told Jones to call 911, but she still failed to do so. When Officers Reyes and Villegas were performing CPR on Savannah, Jones came into the living room and falsely said she had just woken up. Officer Villegas asked Jones who was

---

[13] Jones also points to Lucero's statement to Detective Aubuchon that he had no doubt Jones "would have done this," but the statement was admitted only as to Lucero. Similarly, Lucero's statement to Detective Aubuchon that Jones told him Savannah was dead was only admitted as to Lucero.

[14] Jones told Officer Reyes she woke up at 10:00 a.m. and Detective Aubuchon that she woke up at 10:30 a.m.

watching the baby, to which Jones did not respond.  Jones made other inconsistent statements to Officer Reyes, including that Lucero was at work the morning of December 31 and that Jones's two older children were in her room the night of December 30, although she later stated the children stayed with their grandmother.

In addition, although Jones admitted she was Savannah's primary caregiver and Savannah was never out of her sight for more than 20 minutes, Jones denied she had seen any bruises on Savannah prior to the day before her death when Jones changed her diaper.  This was not credible given that at the time of her death Savannah had bruises all over her body.  Further, Dr. Ribe testified that one skull fracture had been healing for weeks and another for days.  Jones tried to minimize Savannah's condition by telling Bertone that Savannah had some bruises, but "they quickly went away."

Evidence of a defendant's consciousness of guilt, including false or misleading statements about the crime, is admissible to prove the crime.  (See *People v. Watkins* (2012) 55 Cal.4th 999, 1028 [jury may consider consciousness of guilt although it is not sufficient by itself to prove guilt]; *People v. Holt* (1997) 15 Cal.4th 619, 678 [trier of fact "may rationally infer that false statements about a crime reflect consciousness of guilt"]; *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1206 [concluding it was a reasonable inference that defendant was aware of his guilt when he made false statements to his sister following the murder of their mother to prevent his sister from discovering she was dead].)

Jones's conduct and statements corroborate Lucero's statements to Detective Aubuchon placing responsibility for Savannah's death on Jones.  Although this evidence connecting Jones to the killing of Savannah """"may be circumstantial or slight

and entitled to little consideration when standing alone,"""" it is sufficient to connect Jones to the unlawful killing of Savannah. (See *People v. Perez*, *supra*, 4 Cal.5th at p. 452.)

C.     *Substantial Evidence Supported Jones's Murder Conviction*
         1.     *Standard of review*
""""[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt.""" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277; accord, *People v. Mora* (2018) 5 Cal.5th 442, 488 ["Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence."].)

""""The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.] '"Although it is the duty of the [trier of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.""""""""  (*People v. Ghobrial*, *supra*, 5 Cal.5th at pp. 277-278; accord, *People v. Casares* (2016) 62 Cal.4th 808, 823-824.)

## 2. *There was substantial evidence to support the trial court's finding of implied malice.*

Murder is the unlawful killing of a human being or fetus "with malice aforethought." (§ 187, subd. (a).) At trial the People relied on a theory of implied malice to support a conviction for second degree murder. Second degree murder is "'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] . . . [Citation.] 'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507; accord, *People v. Chavez* (2018) 22 Cal.App.5th 663, 682.)

The Supreme Court has "'interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.'"'" (*People v. Soto* (2018) 4 Cal.5th 968, 974; accord, *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358 ["'Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions.' . . . '[L]ike all other elements of a crime, implied malice may be proven by circumstantial evidence.'" [Citations omitted.]].)

Jones contends substantial evidence did not support her conviction for murder because there was no evidence that she

32

"abused, mishandled, or assaulted" Savannah or that Savannah's injuries were caused in her presence. We disagree. In deciding whether substantial evidence supports Jones's convictions, we consider the evidence corroborating Lucero's statements to Detective Aubuchon in addition to Lucero's statements.[15] Dr. Ribe testified that the cause of Savannah's death was blunt force trauma to Savannah's abdomen and body. Dr. Ribe and Bertone described Savannah as having bruises on her forehead, face, chin, chest, abdomen, back, and knees. The fractures to Savannah's skull had been healing for days or weeks. Dr. Ribe opined that Savannah's injuries were caused by an adult striking the baby and were not caused accidentally.

As we discuss above, there was significant evidence of consciousness of guilt. Jones admitted she was Savannah's primary caregiver and had not let Savannah out of her sight for more than 20 minutes. Yet Jones denied seeing Savannah's bruises prior to the day before her death when she changed Savannah's diaper. Jones admitted to Bertone that she had seen

---

[15] We consider all the evidence in deciding whether there was substantial evidence to support Jones's convictions for purposes of a retrial. "[W]hen reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted. '[W]here the evidence offered by the State and admitted by the trial court— whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial.' [Citation.] Accordingly, 'a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause . . . .'" (*People v. Story*, *supra*, 45 Cal.4th at pp. 1296-1297; accord, *People v. Lara* (2017) 9 Cal.App.5th 296, 328, fn. 17.)

33

some bruises, but added, "they quickly went away." This was not a credible statement given the severity of the bruising all over Savannah's body. Lucero stated that he confronted Jones about the bruises on December 29, but Jones only responded that Savannah was constipated. Jones denied that she saw Savannah's bruises that day, even though she observed Lucero bathe Savannah. Jones also denied she knew what caused Savannah's bruises.

Although Jones found Savannah unresponsive and cold to the touch when she woke up on December 31, she failed to call 911, even after Aguirre and Lucero directed her to do so. When Officers Reyes and Villegas attempted to resuscitate Savannah, Jones walked into the room and falsely stated she had just woken up. Jones later provided inconsistent statements to Officer Reyes and Detective Aubuchon as to where Lucero was the morning of December 31 and whether Jones's two older children were in the house the night before Savannah's death.

Savannah's malnutrition also contributed to her death. Although Jones stated to multiple people that she regularly fed Savannah, Savannah had lost weight in the six weeks before her death and, as Dr. Murray opined, Jones's failure to take her to a doctor was a contributing cause of death. Lucero asked Jones to take Savannah to the doctor—both for the malnutrition and the bruises, but she did not. Given the severity of Savannah's injuries and her weight loss, the urgent need for medical attention would have been apparent. It is a reasonable inference that Jones did not take Savannah to the doctor or call 911 because she did not want a doctor or the police to see Savannah's injuries.

As the trial court concluded, it is reasonably inferable that Jones, who "had virtually sole possession and custody of that child" and "showed a consciousness of guilt," caused Savannah's

34

injuries. The severe nature of the injuries, inflicted over a period of weeks while Savannah was in the primary care of Jones, coupled with Jones's failure to take Savannah to a doctor and later to call 911, support the trial court's finding that Jones inflicted the injuries deliberately with knowledge "'"'that [her] conduct endanger[ed] the life of another and [she acted] with conscious disregard for life.'"'"' (*People v. Cravens*, *supra*, 53 Cal.4th at p. 507.) Substantial evidence supports the trial court's finding beyond a reasonable doubt that Jones committed second degree murder.[16] (*People v. Ghobrial*, *supra*, 5 Cal.5th at p. 277; accord, *People v. Mora*, *supra*, 5 Cal.5th at p. 488.)

## DISPOSITION

The judgment is reversed.

FEUER, J.

We concur:

PERLUSS, P. J.

---

[16] Jones does not assert an argument that there was insufficient evidence to support her conviction for child abuse. In any event, the same evidence that supports her conviction for second degree murder provides substantial evidence to support her conviction for child abuse.

ZELON, J.