Filed 9/21/20  P. v. Robinson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>TROY LEE ROBINSON,<br><br>        Defendant and Appellant. | A158100<br><br>(City & County of San Francisco<br> Super. Ct. No. SCN170967) |

Troy Lee Robinson appeals from the trial court's order sustaining consolidated petitions to extend his commitment as a mentally disordered offender (MDO) pursuant to Penal Code section 2970.[1]  He argues the record does not affirmatively establish that he knowingly and intelligently waived his right to a jury trial.  He also contends there was insufficient evidence that he posed a substantial danger of physical harm to others or that he has serious difficulty controlling his dangerous behavior.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Robinson suffers from schizophrenia, which was first diagnosed in 1993.  In 1999, Robinson pled guilty to one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)).  The offense involved an incident in which Robinson attacked a stranger at a crosswalk without

---

[1]     All subsequent statutory references are to the Penal Code.

1

provocation, punching her four times.  The victim was found lying on the sidewalk bleeding from her lips and mouth.  In later discussions about the offense, Robinson recounted that he heard voices telling him to " 'hit someone black' " or to assault black women.  Also, he was angry and stressed at the time because he had been kicked out of his board and care home, and he was drinking on top of taking his medications.  In March 1999, the trial court sentenced Robinson to two years in state prison.

Within months of his sentencing, Robinson was transferred to Atascadero State Hospital pursuant to section 2962.  Thereafter, the district attorney annually filed petitions to extend his MDO commitment, which the trial court granted.  (§ 2970.)  Robinson waived his right to a jury trial at all of these extension proceedings.  At some of the hearings, he consented to the extensions via written waivers stating he understood his right to a jury trial by twelve people where the People would have the burden of proving to all of them beyond a reasonable doubt that he is a person described by section 2970.

The instant appeal concerns consolidated extension petitions filed in March 2018 and March 2019.  The court held a hearing on these petitions in July 2019, and Robinson personally appeared with counsel.  At the outset of the hearing, the People indicated it was necessary to obtain Robinson's waiver of his jury trial right.  The following colloquy ensued:

"THE COURT:  Will [Mr. Robinson] be waiving his right to a jury trial?

"[DEFENSE COUNSEL]:  May I admonish him, Your Honor?

"THE COURT:  Please.

"[DEFENSE COUNSEL]:  Mr. Robinson, you have a right to have a trial by a jury.  Do you know what a jury trial is?

"[ROBINSON]:  I heard from inmates.

2

"[DEFENSE COUNSEL]: It's about 12 people from the community that come and hear the evidence.

"[ROBINSON]: Right.

"[DEFENSE COUNSEL]: We're not doing that today. What we have today is a trial in front of the judge and the judge makes all the decisions.

"[ROBINSON]: Would the lady show up?

"[DEFENSE COUNSEL]: Mm-hm.

"[ROBINSON]: Oh, God.

"[DEFENSE COUNSEL]: My question is, do you give up your right . . . to have jury trial today and agree to proceed with the judge hearing your case called a court trial?

"[ROBINSON]: DA has to decide?

"[DEFENSE COUNSEL]: No, the DA doesn't get to decide. That's your right.

"[ROBINSON]: I don't know what my rights --

"[DEFENSE COUNSEL]: You give up your right to a jury trial?

"[ROBINSON]: Yes, I do.

At the court trial that followed, Robinson's treating psychologist, Dr. Onofre, was the sole witness. She was designated an expert in psychology and "in the mentally disordered offender area." We briefly summarize her testimony here.

Dr. Onofre testified that Robinson was diagnosed with schizophrenia, a "severe mental illness," and that he also has a substance abuse diagnosis. She opined that his schizophrenia is not in remission and that he currently poses substantial danger of physical harm to others if released, in part because he still exhibits the same kinds of symptoms he did at the time of the commitment offense, such as hearing voices and experiencing confusion.

3

Dr. Onofre also concluded that Robinson has no "forensic release prevention plan" to address his symptoms, triggers, or medication compliance if released into the community and noted Robinson's statements that he planned on drinking and likely discontinuing his medication if released. She also reported a statement Robinson made to her the day before his hearing that he refused to meet with the Department of State Hospital's conditional release program (CONREP) during a recently scheduled biannual visit because "he wasn't ready to leave the hospital and wasn't ready to go out on CONREP."

The trial court found beyond a reasonable doubt Robinson has a severe mental disorder that is not in remission or that cannot be kept in remission without treatment. The court further found that, by reason of his disorder, he presents a substantial danger of physical harm to others. The court granted the requested extension of Robinson's MDO commitment until September 30, 2020. Robinson appealed.

## DISCUSSION

### A. Knowing and Intelligent Waiver of the Right to a Jury Trial

Robinson contends the order extending his MDO commitment must be reversed because the record does not affirmatively show he knowingly and intelligently waived his right to a jury trial. For the reasons below, we conclude otherwise.

An MDO facing an extension of his or her commitment has a right to a jury trial. (§ 2972, subd. (a)(1)–(2).) Like a criminal defendant's waiver of a jury trial, the subject MDO's waiver must be knowing and intelligent. (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1125.) "[A] knowing and intelligent jury waiver requires an appreciation of the *nature* of the jury trial right and the *consequences* of forgoing this right." (*People v. Sivongxxay*

4

(2017) 3 Cal.5th 151, 171 (*Sivongxxay*).) But while the trial court must advise the subject MDO of the right to a jury trial and secure a personal waiver of the right (§ 2972, subd. (a)(1)–(2)), this does not mean the MDO is constitutionally entitled to be " 'canvassed by the trial court' " when giving the waiver. (*Sivongxxay*, at p. 168.) Our Supreme Court has "eschewed any rigid formula or particular form of words that a trial court must use in taking a jury waiver," emphasizing that " ' "[m]atters of reality, and not mere ritual, should be controlling." ' " (*Id.* at pp. 169–170.)

That said, the Supreme Court has offered "general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent, and to facilitate the resolution of a challenge to a jury waiver on appeal." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) Namely, the court recommends that trial courts "advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including . . . that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Ibid.*) The court also recommends that trial courts "take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails," such as "by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived." (*Id.* at pp. 169–170.)

"[A] jury waiver is only valid ' " 'if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances.' " ' " (*People v. Jones* (2018) 26 Cal.App.5th 420, 429 (*Jones*).) Whether a defendant knowingly and intelligently enters such a waiver is reviewed de novo. (*People v. Vargas* (1993) 13 Cal.App.4th 1653, 1660.)

*Sivongxxay*, *supra*, 3 Cal.5th 151, is instructive. In *Sivongxxay*, the trial court advised the capital defendant—a Laotian refugee with no formal education and limited English proficiency—that "he had a right to a jury trial, that a jury consists of 12 people from the community, that he would have the right to participate in the selection of the jury, and that waiver of the right to a jury would mean the judge alone would determine his guilt or innocence and any resulting punishment." (*Sivongxxay*, at p. 167.) In concluding the defendant knowingly and intelligently waived his jury trial right, the court relied on (1) the foregoing advisement and (2) the specific circumstances that the defendant was represented by counsel and was assisted by a translator, that the defense initiated the request for a court trial, and that the defendant had two prior experiences with the criminal justice system, having pled to offenses in other states. (*Ibid.*) The court found the waiver valid despite the fact that "the trial court did not mention that a jury must be impartial, and must also be unanimous." (*Id.* at p. 168.)

Here, as in *Sivongxxay*, Robinson was represented by counsel. And just as the court advised in *Sivongxxay*, counsel here advised Robinson of his right to a jury trial and also that, while a jury trial would involve "12 people from the community that come and hear the evidence," a court trial is where "trial [is] in front of the judge and the judge makes all the decisions." Moreover, counsel told Robinson it was for him to decide whether to waive the right to a jury trial.

6

Perhaps more significantly, the record demonstrates that Robinson has a long history with the criminal justice system or, more specifically, the MDO commitment process. (§ 2960 et seq.) His sentencing transcript shows that when he pled guilty to his underlying offense in 1999, his attorney advised him of his jury trial right and explained he could not be convicted unless all 12 jurors agreed beyond a reasonable doubt. Subsequent to his 1999 plea, Robinson was committed and recommitted every year under the MDO scheme over the course of the next 20 or so years at a dozen or so separate hearings. Robinson waived his jury trial right for all of these proceedings.

At some of the hearings (in 2004, 2006, 2007), Robinson consented to the extensions of his commitment via written waivers stating he understood he had a right to a jury trial by twelve people where the People would have the burden of proving to all of them beyond a reasonable doubt that he is a person described by section 2970. (Capitalization omitted.) In each of these written waivers, Robinson asserted he was fully informed of the rights set out and discussed the matter with his attorney. He said the same things in a declaration entitled "Waiver of Right to Jury Trial and Declaration" that he signed in 2009. That declaration also included Robinson's statement that he understood waiving the right to a jury trial would mean a trial before the court, which meant a judge would hear the evidence and the People would have to prove to the judge beyond a reasonable doubt that he was a person described in section 2970. Beyond these written waivers, the record also contains transcripts from recommitment hearings (in 2009, 2015, 2016, 2017) where Robinson waived his jury trial right on the record. The transcript from the 2009 proceeding also shows Robinson indicating that he reviewed his written jury trial waiver with his attorney and understood what he was signing.

7

Finally, a proper weighing of the totality of the circumstances requires that we take into account indications that Robinson wanted to be recommitted because was not ready to leave the hospital setting. (See *People v. Daniels* (2017) 3 Cal.5th 961, 1029 (*Daniels*) (conc. & dis. opn. of Kruger, J.) [concluding the totality of circumstances—including "indications in the record that defendant's overarching aim throughout the proceedings was simply to accept responsibility for the charged crimes"—supported validity of guilt phase jury trial waiver]; see also *id*. at p. 1022 (conc. & dis. opn. of Corrigan, J.) ["Given [the defendant's] expressed desire to be convicted and punished, it strains credulity to suggest that his jury trial waiver would have been materially more informed had he been given more detail."].) Dr. Onofre testified that Robinson told her the day before his MDO extension hearing that he refused to meet with CONREP during their most recent biannual visit because "he wasn't ready to leave the hospital and wasn't ready to go out on CONREP." Robinson's lack of a plan for managing his medications and substance abuse in the community also signals that his aim at the extension hearing was not to actually avoid recommitment.

Viewed as a whole, the circumstances in this case reflect that Robinson's waiver of his jury trial right was knowing and intelligent.

In reaching this conclusion, we acknowledge the colloquy here did not perfectly track *Sivongxxay*'s guidelines for jury trial waiver colloquies.[2] (*Sivongxxay, supra*, 3 Cal.5th at pp. 169–170.) In alignment with those guidelines, the trial court allowed Robinson's attorney to admonish him regarding the jury trial right, and counsel in fact informed Robinson that a jury is made up of 12 persons in the community and that waiving the jury

---

[2]    We encourage, to the extent practicable, compliance with the guidelines in *Sivongxxay*.

trial right would mean the judge alone would decide the case. (See *Daniels*, *supra*, 3 Cal.5th at p. 1019 (conc. & dis. opn. of Corrigan, J.) ["[The defendant] was advised that he had a right to be tried by a jury drawn from members of the community, and that if he waived jury trial, the court alone would determine the issues . . . . *This is the essence of the jury trial right.*"], italics added.) But neither the court nor counsel told Robinson all 12 jurors must unanimously agree, and defendant was not told he could participate in jury selection through counsel. (See *Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) The court also did not take any additional steps to ensure, on the record, that Robinson understood his jury trial right. (See *id.* at pp. 169–170.)

But *Sivongxxay* made clear that its colloquy guidelines are only advisory and that departures from its recommendations—which occurred in that very case—would "not necessarily render an ensuing jury waiver invalid." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 170; see *Jones*, *supra*, 26 Cal.App.5th 420, 430–431, and cases cited.) *Sivongxxay* also emphasized that the validity of a jury trial waiver required examination of the totality of the circumstances, not merely the robustness of the colloquy. (*Sivongxxay*, at p. 167.) So, while the colloquy here did not mirror the *Sivongxxay* guidelines, we may reasonably infer from the other circumstances, including the admonishments Robinson actually received and all the previous times he waived his jury trial right after advisements, that Robinson understood the nature of the jury trial right and what he was giving up.[3]

_____

[3]    Robinson does not contend that he lacked capacity to make a knowing and intelligent waiver, and affirms in his briefing that there was no substantial evidence that he lacked the capacity to make a knowing and voluntary waiver. Moreover, nothing in the record reflects that he was incapable of understanding the nature of the jury trial right (which is straightforward) or that he had forgotten it. (See *Daniels*, *supra*, 3 Cal.5th at p. 1023 (conc. & dis. opn. of Corrigan, J.).)

Robinson contends that, in addition to the aforementioned colloquy deficiencies, he was never told that the jurors would be charged with *deciding* his case. This is unpersuasive. Reasonably understood, the colloquy here conveyed the point that a jury trial would entail the jury deciding the case. "The concept of judgment by one's peers is probably implicit, for most persons, in the term 'jury trial' itself." (See *U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, 1180, fn. 2.) Further, counsel's admonishment explicitly contrasted a "jury trial" where "12 people from the community . . . come and hear the evidence" with a "court trial" where a "judge makes all the decisions." And beyond the colloquy, over the years Robinson signed numerous written waivers stating that he understood he had a right to a jury trial by twelve people to whom the People would have to prove beyond a reasonable doubt that Robinson is a person described by section 2970. On this record, the totality of circumstances more than amply supports a finding of Robinson's understanding that a jury trial meant the jury would decide whether he met the criteria for recommitment.

Robinson also points to two things he said during the relevant colloquy, "Would the lady show up?" and "I don't know what my rights --," as evidence that he did not understand the nature of his right to a jury trial. We are unpersuaded. His question "Would the lady show up?" is peculiar and appears to be a non-sequitur. But the oddness of that question does not suggest Robinson's lack of understanding about the nature of the right to a jury trial. Next, his statement, "I don't know what my rights --," was incomplete and followed defense counsel's explanation in clear terms that the district attorney would not decide whether to give up the jury trial right because it was Robinson's right to make that decision. It is unclear what Robinson meant by this statement or why he did not finish it. It may be that

10

Robinson did not finish his sentence because he changed his mind about what he wanted to say. While the incomplete statement may be interpreted as problematic when considered in isolation on a cold transcript, the statement evidently raised no cause for concern for those personally observing Robinson's colloquy responses and demeanor. Robinson made this statement while his own counsel was advising and questioning him. Counsel apparently saw no need to ask Robinson about his incomplete statement, and his very next question to Robinson was whether he waived his right to a jury trial, to which Robinson answered, "Yes, I do." All in all, we may reasonably infer from the overall course of the colloquy that Robinson's question and incomplete statement did not reflect a misunderstanding about the nature of the jury trial right.

Finally, Robinson relies on *People v. Blancett* (2017) 15 Cal.App.5th 1200 (*Blancett*) and *Jones*, *supra*, 26 Cal.App.5th 420 to buttress his claim that his waiver was not knowing or intelligent. Those cases are easily distinguishable.

*Blancett* was a case involving "a barebones colloquy," in which the trial court "asked *only* if [the MDO] was 'okay' with a court trial instead of a jury trial." (15 Cal.App.5th at p. 1206, italics added.) The court "did not inform [the MDO] that he had a right to a jury trial, nor did the court explain the significant attributes or mechanics of a jury trial. [Citation.] Neither did the court inquire whether [the MDO] had sufficient opportunity to discuss the decision with his attorney, whether his attorney explained the differences between a bench trial and a jury trial, or whether [the MDO] had any questions about the waiver." (*Ibid.*) Furthermore, the hearing was the MDO's *initial* commitment proceeding, and the record did not suggest the MDO was familiar with MDO proceedings or understood he was entitled to a

11

jury trial. (*Ibid.*) Based on the totality of the circumstances, the Court of Appeal concluded the MDO did not knowingly and intelligently waive his jury trial right. (*Ibid.*)

In *Jones*, the prosecutor asked the two defendants if they understood their right to a jury trial and if they agreed to waive it and have the judge alone decide the case. (26 Cal.App.5th at p. 428.) The record reflected that the appealing defendant had some discussion with her attorney about her jury trial right, but it did not show the specifics of that discussion. (*Id.* at p. 435.) In concluding the sparse record did not affirmatively show a knowing, intelligent, and voluntary waiver, the Court of Appeal observed the record failed to indicate that the trial court ever advised the appealing defendant she had a right to a jury trial or about the nature of that right, i.e., that the jury would be comprised of 12 people from the community. (*Id.* at pp. 435–437; see *id.* at p. 431 [noting cases upholding waivers involved defendants who were specifically advised "they would be giving up the right to have their case decided by 12 members of a jury drawn from the community or comprised of citizens"].) Moreover, the appealing defendant in *Jones* "had no experience with the criminal justice system." (*Id.* at p. 437.)

Here, in contrast to *Blancett* and *Jones*, Robinson was not merely asked if he was "okay" with a court trial, or if he understood his right and agreed to waive it. Instead, his own attorney advised him, on the record, that he had a right to a jury trial which involved 12 members of the community who would hear his case, as opposed to a court trial where a judge alone would decide the case. And as discussed, this was far from Robinson's first MDO commitment proceeding or encounter with the right to a jury trial.

In sum, we conclude that under the totality of the circumstances, Robinson's waiver was knowing and intelligent.

**B. Sufficiency of the Evidence**

"The MDO Act establishes a comprehensive scheme for treating prisoners who have severe mental disorders that were a cause or aggravating factor in the commission of the crime for which they were imprisoned." (*People v. Garcia* (2005) 127 Cal.App.4th 558, 563.)  After an initial commitment as an MDO, subsequent extensions are for one-year increments. (§ 2972, subd. (c).)  Three criteria must be satisfied to extend an MDO commitment:  first, the patient must have a severe mental disorder; second, the disorder must not be in remission or cannot be kept in remission without treatment; and third, the patient must present a "a substantial danger of physical harm to others" because of the disorder.  (*Ibid.*)  " '[S]ubstantial danger of physical harm' does not require proof of a recent overt act." (§ 2962, subd. (g).)

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding.  [Citation.]  ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]  Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " ' " (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082–1083.)

13

Here, Robinson contends the evidence was insufficient to support the trial court's finding that he posed a substantial danger of physical harm to others. We disagree.

Robinson's treating psychologist, Dr. Onofre, testified that Robinson continues to suffer from the same mental disorder and symptoms he was operating under at the time of the commitment offense. For instance, he still hears voices (albeit the voices no longer told him to hurt himself or others) and experiences confusion. Moreover, Dr. Onofre testified that Robinson presently possesses limited insight into his mental illness, and that he has no "forensic release prevention plan," i.e., no plan for release into the community to address the symptoms of his mental illness, such as triggers and medications. For example, Robinson was both drinking alcohol and taking medications (which he took inconsistently) at the time of his offense. But he disclosed to Dr. Onofre that "he planned [to take] a few sips of alcohol when released," that he believed he would continue to use alcohol if released, and that he would likely discontinue his medication if released. Based on the foregoing, Dr. Onofre opined that Robinson would likely stop taking his medications if the decision were left to him alone.

Significantly, Dr. Onofre identified Robinson's alcohol abuse and medication noncompliance as major risk factors linked to future violence. She testified that alcohol generally exacerbates symptoms of mental disorders, such as causing more auditory hallucinations and causing those hallucinations to become more threatening. Moreover, in a June 2019 nursing evaluation, Robinson had told hospital staff that he believed his medications " '[k]eep [him] out of fights.' " (Italics omitted.) And when asked what he thought might happen if he stopped taking his medications, he responded, " 'Get in fights'." (Italics omitted.) Although Dr. Onofre

14

acknowledged that Robinson had not actually been physically violent in many years,[4] she attributed that fact largely to the circumstance that he lived in a structured hospital setting with staff constantly available. Dr. Onofre indicated that while Robinson's risk for violence in the hospital was low, it would increase if he were released into the community. In her words, "if he was released, it's just a matter of time before he becomes unstabilized and decompensates and could potentially harm somebody else or himself." Ultimately, when asked if defendant posed a substantial danger of physical harm because of his severe mental disorder, Dr. Onofre opined he did. ~(6RT 324:10-14)~ " 'A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5.' " (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.)

Given the foregoing, we conclude substantial evidence supports the trial court's dangerousness finding.

Robinson's contentions to the contrary are unavailing. Robinson argues Dr. Onofre's opinions do not support the conclusion that he posed a substantial danger to others because she could not say with certainty that he would relapse, stop taking medications, and then harm others. But Robinson cites no authority suggesting absolute certainty is required. The one authority he does cite simply posits that expert speculation is not evidence and that expert opinion should be grounded in foundational facts. (*People v. Bendovid* (2018) 30 Cal.App.5th 585, 594.) Here, Dr. Onofre was not speculating; she based her opinion on Robinson's past and present behaviors and other factual circumstances.

---

[4] Prior hearing transcripts in the record indicate that Robinson's last act of aggression in the hospital occurred in 2012.

Robinson additionally alleges that Dr. Onofre "had only had brief interactions with [him] before testifying." Specifically, he claims Dr. Onofre had been treating him for only six months before the hearing, and during that time she checked in with him only once a week for brief periods lasting only a few minutes. This, however, goes to the weight of Dr. Onofre's uncontroverted testimony, and we decline Robinson's invitation to reweigh the evidence.[5]

Robinson also argues that Dr. Onofre was unable to establish any nexus between his commitment offense and his auditory hallucinations. But Dr. Onofre's opinion about Robinson's dangerousness was not based solely on Robinson's ongoing auditory hallucinations. Rather, the broader point of her testimony was that several of the circumstances at the time of the commitment offense—which are linked with his dangerousness—are extant, or will be if Robinson is released.

Robinson further claims the trial court misunderstood his statement that he "might" get in fights if he stopped his medication as meaning that he "would" get into fights. He alleges that instead of supporting the court's conclusion, this statement actually showed his insight into his mental illness

---

[5]     Robinson's characterizations about the amount of interaction between himself and Dr. Onofre are also incomplete. The testimony at the hearing showed that Dr. Onofre had Robinson on her "case load" as his primary psychologist since May 2018, but she was out on leave from June to November 2018. That said, Dr. Onofre testified that prior to becoming Robinson's primary psychologist, she interacted and met with him several times to talk about his symptoms. After becoming his primary psychologist and upon her return from her leave, she has had weekly one-on-one meetings with him that vary in length depending on what Robinson can tolerate, which is not much. Depending on the day, these meetings sometimes last 15 minutes. Beyond these weekly meetings, Dr. Onofre testified that she is at the hospital four times per week and that she sees Robinson each day she is there.

16

and substance abuse. We reject this. Even assuming this statement reflected some measure of Robinson's insight into his mental illness or substance abuse, it remains the case that Dr. Onofre concluded he had "very limited" or "poor" insight. Thus, Robinson's limited insight on this one point does not alter our determination that substantial evidence supports the court's dangerousness finding.

Finally, we address Robinson's contention that there is no evidence he has "serious difficulty controlling [his] dangerous behavior," which he argues is necessary to establish the requisite dangerousness for recommitment. Though he acknowledges he is unaware of any published authority requiring such evidence to support the extension of an MDO commitment, he points to decisional law imposing such a requirement for extensions in the context of insanity commitments, where the standard for extensions is nearly identical. (§ 1026.5, subd. (b)(1).) While Robinson does not contend an express finding on this point is required, he maintains there must be substantial evidence of it for his commitment to survive constitutional scrutiny.

As case law recognizes, federal due process requires a showing that a civilly committed person, such as Robinson, has "serious difficulty in controlling [his] dangerous behavior." (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 41; *People v. Williams* (2003) 31 Cal.4th 757, 759; cf. *People v. Putnam* (2004) 115 Cal.App.4th 575, 580–582.) The People do not argue to the contrary. That said, the substantial evidence we have identified as supporting the trial court's dangerousness finding also suffices as substantial evidence of Robinson's serious difficulty in controlling his dangerous behavior. Again, this evidence includes Dr. Onofre's testimony, based on her knowledge of Robinson's background and her interactions with him, that his risk for violence is likely to increase outside of a supervised hospital setting.

17

It also includes the factual circumstance that 20 years after his initial commitment, Robinson still has no plan for dealing with his triggers, substance abuse, or medications if released.  Instead, he plans on using alcohol and likely will discontinue his medications, despite his own understanding that his medications " '[k]eep [him] out of fights'."  (Italics omitted.)

In sum, we conclude substantial evidence supports the order extending Robinson's MDO commitment.

## DISPOSITION

The order of the trial court extending Robinson's MDO commitment is affirmed.

_____

FUJISAKI, ACTING PJ.

We concur.

_____

PETROU, J.

_____

JACKSON, J.

(A158100)

19