Filed 1/29/25  P. v. Evensen CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>RICHARD PATRICK EVENSEN,<br><br>          Defendant and Appellant. | A169158<br><br>(Napa County<br>Super Ct. Nos. CR165642 &<br>CR168007) |

Defendant Richard Patrick Evensen appeals from his commitment to the State Department of State Hospitals (DSH) as a sexually violent predator.  He asserts that the trial court's finding that his convictions were sexually violent was not supported by substantial evidence.  Alternatively, he contends that the trial court violated his right to equal protection by failing to advise him adequately of his right to a jury trial or to secure a knowing, intelligent, and voluntary waiver of that right before conducting a court trial. Finding no error, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. *Evensen's Relationship with Jane Doe One*

Jane Doe One met Evensen when she was 16 and he was 19. They started dating a few months later, and for the first three to four months had a consensual sexual relationship.[2] Evensen told Jane Doe One that he had a " 'pee and poo fetish,' " which she accepted at first. During this part of their relationship, Evensen asked Jane Doe One to save her urine and feces for him. At one point, he sent her a photograph of himself masturbating using her feces. She deleted it, told him he was gross, and never consented to use of feces during their sexual encounters.

When they had been dating for six or seven months, Jane Doe One awoke to find Evensen sodomizing her while she slept. She "freaked out" and asked him what he was doing. He responded that he was having sex with her because it was easier when she was sleeping, that he had been doing it for some time, and that this was the first time she had woken up. Doe One left the residence.

Jane Doe One described Evensen "secluding her" from her family and friends. He told her that her friends were "losers" and a bad influence. He always wanted her to stay with him at his family home or him to stay with her at her family home. He went to her workplace while she was working, and she went to his workplace while he worked. Eventually she had no

---

[1] Our factual recitation is gleaned from exhibit 1, which we discuss further below, and which was admitted at trial pursuant to the stipulation of both parties.

[2] When speaking to police, both Jane Doe One and Jane Doe Two described parts of their sexual relationships with Evensen as "consensual." We adopt their terminology to refer to actual consent, recognizing that both minor victims were incapable of legal consent at the time of the acts described. (See Pen. Code, § 261.5, subd. (a).)

friends to confide in, and she was afraid to confide in her mother because she was embarrassed.

Jane Doe One reported that Evensen videotaped himself performing sex acts on her while she slept. She woke up once after he ejaculated on her face. He then showed her a video of himself masturbating over her while she slept and ejaculating on her face. Evensen also showed her videos of himself sodomizing her while she slept. Jane Doe One described finding child pornography on Evensen's computer. She told him it sickened her and told him to delete it. He eventually agreed, after pointing out that the children depicted must have enjoyed it because they were smiling. Evensen asked Jane Doe One to dress in little girls' clothing during their sexual encounters.

Evensen continued to sodomize Jane Doe One while she slept and refused to use lubricant, which made her anus very painful. After dating Evensen for 13 months, Jane Doe One broke up with him because of the isolation from her friends and family. The year after she broke up with Evensen, a doctor noticed tearing in her anus, and, five years after her relationship with him, she still had a very sensitive anus and had to be careful what she ate and how she cleaned it.

During his evaluation interview with Dr. Susan Napolitano from the DSH, Evensen described the incident in which Jane Doe One woke up while he was sodomizing her. Evensen told Dr. Napolitano that "[w]hen she woke up she thought she had defecated but it was him pulling his penis out of her anus. Despite her resistance he continued to have sex with her." Later in the interview, Evensen clarified this sodomy incident, stating, "[T]he first time he did it she woke up and resisted." Evensen also "acknowledged behaving in a

3

controlling manner with the victim and secluding her from her friends and family."

## B. Evensen's Relationship with Jane Doe Two

Three months after the end of his relationship with Jane Doe One, Evensen began dating Jane Doe Two when she was 17 and he was 19. Jane Doe Two was friends with Jane Doe One and met Evensen as a result of their friendship. For the first two months, they had a consensual sexual relationship. At that point, Evensen disclosed to Jane Doe Two that he was sexually attracted to five- to seven-year-old girls and showed her child pornography on his computer. He insisted that she call him " 'Daddy' " when they were having sex. Evensen also asked Jane Doe Two to save her urine for him. He filmed himself assaulting Jane Doe Two while she slept, including video of him raping her and urinating and ejaculating on her face. She had no idea he was doing those things until he later showed her the videos.

Approximately three or four months into the relationship, Evensen forcibly raped Jane Doe Two while she was awake. Beginning in August 2008, Evensen began forcibly raping Jane Doe Two while she was awake three to four times a week, usually while watching child pornography. He did not film the forcible rapes. During this time, he also continued to sexually assault her while she slept and record the assaults.

Evensen isolated Jane Doe Two, forcing her to stay at his home while he worked. Jane Doe Two was afraid of Evensen and "never disobeyed him" because he lost his temper very easily. Evensen eventually started taking away Jane Doe Two's birth control pills because he wanted her to get pregnant so that if they had a baby girl, he could " 'cum on their child while changing her diaper.' "

4

Jane Doe Two dated Evensen for approximately 18 months. She broke up with Evensen due to the trauma from the sexual assaults and being exposed to child pornography. After they broke up, Evensen continued to send her Facebook messages. She confronted him in the messages with his repeated rapes, and he did not deny the accusations.

During Dr. Napolitano's interview with Evensen, he admitted that he raped Jane Doe Two while unconscious, forcibly raped her while awake, and forced her to orally copulate him while she was awake. He told Dr. Napolitano that he raped Jane Doe Two sometimes three or four times in a day, and that "he found it more arousing to have sex with her when she was asleep because he preferred to have control over her." He believed that Jane Doe Two was afraid of him and acknowledged controlling her.

## C.    *Defendant's Arrest and Convictions*

In February 2013, the Napa Police Department investigated computer users downloading child pornography in Napa County. They identified downloads of child pornography originating from an IP address for Evensen's mother and, through a search warrant, got his home address. Police obtained and served a search warrant on Evensen's home. When police arrived to execute the search warrant, they found Evensen in the bathroom, naked, wet from the shower, and with fecal matter covering his front. In the shower, they located the lower half of a mannequin dressed in young girls' clothing with a simulated vagina attached to it. The doll was also covered in feces.

In Evensen's bedroom, police observed a plastic sheet on his bed covered with feces, and several bags of feces on the floor. Evensen's room had a large projector screen connected to the ceiling. The projector was connected to Evensen's laptop, displaying an image of a 12- to 14-year-old girl with braces on her teeth looking into the camera. Police located computer

5

equipment, hard drives, disks, and thumb drives containing both adult and child pornography.

After being *Mirandized*,[3] Evensen admitted to downloading large volumes of child pornography and storing it on various hard drives. He explained that when police arrived, he had been having sex with the " 'doll' " that they located and was washing it off. Evensen told the officers he had been watching child pornography of a young girl urinating while having sex with the doll.

After Evensen's arrest, Jane Doe Two contacted the police to assist them with their case against him. She related the history of their relationship recited above. Jane Doe Two identified Jane Doe One in her interview with police, leading police to interview Jane Doe One. Jane Doe One related the history of her relationship with Evensen as described above.

After Jane Doe Two came forward, police identified video files on Evensen's hard drives depicting him sexually assaulting her. One such video showed Evensen forcing his penis into Jane Doe Two's mouth and plugging her nose to force her to open her mouth when she attempted to resist him. Jane Doe Two was still 17 years old on the date of that incident. Jane Doe Two later reviewed the video footage and confirmed that sexual assaults occurred during her relationship with Evensen without her consent and while she was asleep as depicted in certain video clips. She could not further pinpoint the specific dates on which the assaults depicted occurred.

In case No. CR168007, the Napa County District Attorney charged Evensen with 19 felony offenses related to Jane Doe One. Counts one and

---

[3] *Miranda v. Arizona* (1969) 384 U.S. 436.

6

two charged Evensen with violations of Penal Code[4] section 286, subdivision (f), sodomy of an unconscious victim. The remaining counts charged violations of section 311.4, subdivision (c), using a minor for sex acts. All counts were charged with a date range spanning the entirety of the dating relationship between Evensen and Jane Doe One. Counts one and two specified the acts of sodomy as "when victim woke up during sodomy" and "another incident," respectively. Evensen pleaded no contest to counts one, two, and three. All remaining charges were dismissed with a *Harvey*[5] waiver.

In case No. CR165642, the district attorney charged Evensen with 24 felony offenses related to Jane Doe Two.[6] For all offenses charging sexual assault of Jane Doe Two, the offenses were charged as occurring on and between the dates reflecting the period of their dating relationship. Each sexual assault charge identified the act charged by reference to the computer file names found by police depicting the assaults. The charges included four expressly forcible offenses, specifically two counts of sodomy by force (counts five and twenty), one count of forcible oral copulation (count four), and one count of sexual penetration by a foreign object (count twenty-four).

Evensen entered pleas of no contest to five counts related to Jane Doe Two, listed below:

---

[4] Undesignated statutory references are to the Penal Code, unless otherwise indicated.

[5] *People v. Harvey* (1979) 25 Cal.3d 754.

[6] The information in case No. CR165642 also contained two charges related to a third victim, and Evensen entered a plea of no contest to one of them. Although evidence related to that offense was presented below to support other elements of the trial court's SVP determination, the trial court did not identify that offense as sexually violent. Because it is not relevant to the issues on appeal, we do not describe it further.

1. count one, distribution of obscene matter depicting a minor (§ 311.10);

2. count three, oral copulation of an unconscious person (former § 288a,[7] subd. (f)) referencing "movie described as 100_1876.mov";

3. count six, rape of an unconscious person (§ 261, subd. (a)(4)), referencing "movies described as MVI_0118.AVI, MVI_0119.AVI, MVI_0120.AVI, and MVI_0121.AVI";

4. count nine, oral copulation of an unconscious person (former § 288a, subd. (f)), referencing "movie described as MVI_1172.AVI";

5. count ten, oral copulation of an unconscious person (former § 288a, subd. (f)), referencing "movies described as MVI_1299.AVI and MVI_1301.AVI."

The police reports documenting the forensic examinations of Evensen's computer media described videos of the acts charged in counts three, six, nine, and ten. For all videos specified in counts three, six, and nine, the descriptions state that Jane Doe Two never woke up while the assaults were committed. For the videos specified in count ten, the verbal description states that Jane Doe Two "suddenly woke up" after the assault had been completed. All remaining charges with respect to Doe Two were dismissed with a *Harvey* waiver, except the counts alleging forcible sexual assault (counts four, five, twenty, and twenty-four), which were dismissed without a *Harvey* waiver. As a result of his pleas in both cases, Evensen was sentenced to a total of 20 years 4 months in prison.

---

[7] Effective January 1, 2019, former section 288a was renumbered to section 287. (Stats. 2018, ch. 423, § 49.)

### D.    *Sexually Violent Predator Proceedings*

In May 2022, the district attorney petitioned to commit Evensen under the Sexually Violent Predator Act (SVPA; Welf. & Inst. Code, § 6600 et seq.) in case No. CR165642 involving crimes against Jane Doe Two.  The district attorney later filed the same petition in case No. CR168007 involving crimes against Jane Doe One.  The matters were tried together.  Evensen waived jury trial.[8]  The People presented two expert witnesses—Dr. Napolitano and Dr. Musacco—both forensic evaluators employed by the DSH.  As mentioned above, the parties stipulated to admission of exhibit 1, a collection of documents including both forensic evaluators' written reports, Evensen's relevant prison records, and the police reports, charging documents, probation reports, and conviction records in each of the two underlying cases.  Relevant to this appeal, Evensen argued that his offenses did not qualify as "sexually violent" within the meaning of Welfare and Institutions Code section 6600 (section 6600) because they were not committed by force, violence, duress, menace, fear, or threat of retaliation.

The trial court sustained the petitions in both cases.  Specifically, it found that Evensen's convictions qualified as sexually violent offenses, that he suffered from a diagnosed mental disorder, that as a result of the disorder he presented a danger to the health and safety of others due to the likelihood that he would engage in sexually violent predatory criminal behavior, and that it was necessary to keep him in custody in a secure facility to ensure the health and safety of others.  The trial court observed that section 6600 permitted use of documentary evidence to demonstrate the details of the offenses, including a predatory relationship with the victims.  (§ 6600,

---

[8] The specifics of the waiver colloquy are detailed in our discussion regarding its adequacy in part II.B., *post*.

subd. (b).) It further opined that it was not "restricted solely to the particular offenses that are the sources of the convictions but the overall conduct." The trial court made the following findings in concluding the offenses were sexually violent: the victims were teenagers, each count charged a very broad date range that encompassed a substantial range of behavior, both victims described forcible acts of sexual violence, descriptions of videos in the evidence supported their accounts, and Evensen acknowledged that he preferred to assault the victims when they were at their most vulnerable. The trial court observed that Evensen's insistence on showing the victims the videos of his conduct "demonstrated a bizarre and, frankly, cruel desire to show his victims how much control he had when they were completely vulnerable, and so I don't have any difficulty finding that the totality of his conduct was predatory." Evensen timely appealed.

## II. DISCUSSION

### A. *Sufficiency of the Evidence of Sexually Violent Offense*

Evensen argues that the trial court erred by finding his convictions sexually violent. We disagree.

### 1. Standard of Review and Legal Framework

The parties agree that the trial court's determination committing a person as a sexually violent predator (SVP) is reviewed for substantial evidence. "In reviewing the evidence sufficient to support a commitment under section 6600, 'courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction.' [Citation.] 'Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be " 'of

10

ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' " (*People v. Carlin* (2007) 150 Cal.App.4th 322, 333.)

An SVP means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others because it is likely that he or she will engage in sexually violent criminal behavior that will be predatory in nature. (§ 6600, subd. (a); *Walker v. Superior Court* (2021) 12 Cal.5th 177, 190 (*Walker*).) When committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threats of future retaliation, certain qualifying offenses are deemed "sexually violent." (§ 6600, subd. (b).) Conviction of one or more qualifying offenses may support a determination that a person is an SVP but may not be the sole basis for that determination. (*Id.*, subd. (a)(3).) Documentary evidence may be used to prove the existence of the prior convictions. In addition, "[t]he details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the [DSH]." (*Ibid.*) " 'Predatory' " means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization. (*Id.*, subd. (e).) The evidence permitted by section 6600, subdivision (a)(3) is not limited to documents contained in the record of conviction. (*People v. Fulcher* (2006) 136 Cal.App.4th 41, 49–50.)

The term "force," as used in the context of forcible sex offenses, has no special legal meaning. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023

(*Griffin*).)  The question is simply whether the defendant uses force to accomplish an act of intercourse against the victim's will, not whether the force used overcame the victim's physical strength or ability to resist.  (*Id.* at p. 1028.)  Prior to *Griffin*, the Fourth Appellate District had concluded that, "the requirement of 'force' [in an analogous statute] simply cannot be stretched to encompass the type of conduct involved in this case, where the victim was penetrated while asleep and where the victim's will was not overcome by any physical force substantially different from or greater than that necessary to accomplish the act itself."  (*People v. Kusumoto* (1985) 169 Cal.App.3d 487, 494.)  More recently, our colleagues in Division Two of this district recognized that *Kusumoto*'s "holding was clearly rejected by our high court in *Griffin*."  (*People v. McCann* (2019) 41 Cal.App.5th 149, 157.)  "[I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker."  (*Griffin*, at p. 900.)

"Duress," in the context of rape, sodomy, and oral copulation, means " 'a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.)  Duress "can arise in a variety of ways related to psychological and/or situational factors between the perpetrator and the victim. . . . ' "Where the defendant is a family member and the victim is young . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to the

12

existence of duress.' " (*People v. Guenther* (2024) 104 Cal.App.5th 483, 516 (*Guenther*).) "These principles translate readily to other circumstances involving an uneven power dynamic between a victim and perpetrator inhabiting a position of authority. While the 'relative ages and sizes' [citation] of the perpetrator and victim may not be as relevant to proving psychological compulsion or duress where . . . the victim is an adult, other factors related to ' "the position of dominance and authority of the defendant" ' [citation] remain salient." (*Ibid.*)

2. **Sufficient Evidence of a Sexually Violent Offense**

Evensen's convictions in cases Nos. CR168007 and CR165642 for qualifying offenses included two counts of sodomy against an unconscious person, one count of rape of an unconscious person, and three counts of oral copulation of an unconscious person. (§ 6600, subd. (b); Pen. Code, §§ 286, subd. (f), 261, subd. (a)(4), former § 288a, subd. (f).) None of these qualifying offenses includes force, duress, menace, fear, or threat of future retaliation as elements. (See CALCRIM Nos. 1033, 1003, 1018.) Each defines the phrase "unconscious of the nature of the act" to mean that the victim is "unable to resist" because the victim meets one of four conditions, including being "unconscious or asleep." (*People v. Miranda* (2021) 62 Cal.App.5th 162, 173.) Therefore, conviction of rape, oral copulation, or sodomy of an unconscious person does not alone establish that the offense is a sexually violent felony within the meaning of section 6600, subdivision (b). (See *People v. Manning* (2014) 226 Cal.App.4th 1133, 1140 (*Manning*).) A finding that someone is an SVP requires only a single qualifying conviction. (§ 6600, subd. (a)(1).)

Evensen argues that the trial court erred by finding his convictions sexually violent based on his "overall conduct" rather than focusing on the specific acts underlying the offenses of conviction. He argues that

13

section 6600 requires the court to restrict its inquiry to the " 'details underlying the commission of an offense that led to a prior conviction.' " By focusing on other sexually violent conduct that had been charged and dismissed in the underlying cases, Evensen argues that the trial court "went far beyond" the permissible inquiry into the details underlying the commission of the convictions. Because all of the convictions occurred while the victims were unconscious and prevented from resisting, he urges, they do not qualify as sexually violent because " '[t]here was no will to overcome.' "

The SVPA "allows the state to petition superior courts for the involuntary civil commitment of certain convicted sex offenders whose diagnosed mental disorders make them a significant danger to others and likely to reoffend after release from prison. The purpose of the SVPA is to protect the public from a select group of criminal offenders (sexually violent predators, or SVPs), and to provide these offenders with the necessary treatment for their mental disorders." (*Walker*, *supra*, 12 Cal.5th at p. 184.) After the adoption of the SVPA, the Legislature amended section 6600, subdivision (a)(3) to permit "the prosecution to show the existence of and details underlying the first element of the SVP determination—a predicate sex-offense conviction—'by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the [DSH]' " in order to "relieve victims of the burden and trauma of testifying about the details of the predicate convictions." (*Walker*, at p. 198.) This hearsay exception thus "allow[s] the prosecution to prove the facts of a defendant's prior qualifying convictions not just with certain documents (like evaluations) but also with multiple-level-hearsay statements contained therein (like police and probation reports, and victim and witness statements they include)." (*Ibid.*)

14

Nothing in the underlying purposes of the SVPA or the language of section 6600 mandates the narrow construction of "details underlying the commission of an offense that led to a prior conviction" that Evensen suggests controls when determining whether an offense is sexually violent. First, subdivision (a)(3) of section 6600 merely codifies a hearsay exception. Moreover, a more reasonable reading of that statute is that it permits evidence (the "details") relevant to establishing the existence of a particular sexually violent offense—i.e., a qualifying conviction committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threats of future retaliation—to be proven through documentary evidence without running afoul of hearsay rules. Presumably, other relevant evidence also would be admissible on this point if it complied with the Evidence Code. Under both situations, evidence involving dismissed counts could be considered to the extent it was relevant to prove the existence of the sexually violent offense, including a predatory relationship with the victim.[9]

Here, we do not have a hearsay issue as both parties stipulated to the admission of the documents comprising exhibit 1 and Evensen expressly

_____

[9] Although the Supreme Court held in *Walker* that hearsay to prove the details of nonpredicate offenses would not be admissible under the hearsay exception set forth in section 6600, subdivision (a)(3), it did not hold that such evidence could not be admitted and considered if otherwise admitted in compliance with the Evidence Code. (*Walker*, *supra*, 12 Cal.5th at p. 199.) Moreover, the nonpredicate conduct in *Walker* involved two discrete prior incidents involving other victims that were charged but did not result in qualifying convictions. (*Id.* at pp. 186–187.) Thus, *Walker* does not speak to our situation—where Evensen's controlling conduct, including other charged acts that did not result in convictions involving *these same victims*, was arguably relevant to prove that the qualifying offenses were predatory and/or committed through force or duress.

waived any *Sanchez* objections that might otherwise apply. (See *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) [precluding use of out-of-court statements as the basis for expert opinion on hearsay and confrontation clause grounds unless an applicable hearsay exception applies].) Moreover, we reject Evensen's suggestion that the trial court's dismissal of the counts involving force in the underlying criminal matter without a *Harvey* waiver somehow limits their use in a subsequent civil proceeding focused on protecting the public and treating the perpetrator. Finally, it seems counterintuitive, especially when attempting to establish that a qualifying conviction was committed through duress, not to consider all of the highly relevant aspects of Evensen's predatory relationships with his victims, including prior forcible sexual acts that did not lead to convictions. (*Guenther*, *supra*, 104 Cal.App.5th at p. 516 [noting the position of dominance and authority of the defendant and his continuous exploitation of the victim is relevant to the existence of duress]; see also *Manning*, *supra*, 226 Cal.App.4th at p. 1141 ["California courts have routinely determined that prior convictions constitute serious or violent felonies by looking to 'the substance of a prior conviction, i.e., the nature and circumstances of the underlying conduct.' " (italics omitted)].)

Nevertheless, we need not definitively resolve the issue on this record. As stated above, commitment as an SVP requires proof of only one sexually violent offense. (§ 6600, subd. (a)(1).) Here, substantial evidence supports the conclusion that two of Evensen's convictions were sexually violent based on his use of force, even without considering the broader "details underlying the commission of an offense" to which Evensen objects. (*Id.*, subd. (a)(3).)

In case No. CR168007, Evensen was convicted in count one of sodomy of Jane Doe One while unconscious. The information described the incident

16

as "when victim woke up during sodomy." In her description of the offense, Jane Doe One stated that she "freaked out" when she woke up during the offense. To Dr. Napolitano, Evensen described that "the first time he did it she woke up and resisted," and that "[d]espite her resistance he continued to have sex with her." Both Jane Doe One's description of "freaking out" and Evensen's admission of continuing to "have sex" with Jane Doe One "[d]espite her resistance" demonstrate that he used force sufficient to overcome Jane Doe One's will to accomplish the act of sodomy within the meaning of *Griffin*.[10] Substantial evidence supports the trial court's determination that count one was accomplished by force, and therefore sexually violent within the meaning of section 6600, subdivision (b).

In case No. CR165642, Evensen was convicted in count six of rape of Jane Doe Two while unconscious. The information referenced four video files depicting the charged act, including files MVI_0119.AVI and MVI_0120.AVI. In MVI_0119.AVI Evensen "puts his fingers near [Jane Doe Two's] anus and has spit on them for lubrication." Evensen then inserts a bottle of sinus rinse into Doe Two's anus. MVI_0120.AVI is described as follows: "Appears to be a continuation of MVI_0119.AVI. In the video you can see [Jane Doe Two's] entire body. She is fast asleep under a blanket. Evensen has pulled back the blanket so her bare buttocks are exposed. You can see the liquid he inserted into her anus coming out. Evensen climbs on the bed behind her and is naked. *He carefully positions* [*Jane Doe Two's*] *legs so he doesn't wake her up.*

---

[10] As stated in CALCRIM No. 359, evidence corroborating Evensen's out-of-court statement admitting to using force to overcome Jane Doe One's resistance was sufficient even if "slight" and "only . . . enough to support a reasonable inference that the crime was committed." Jane Doe One's description of waking up and "freaking out" is sufficient to meet this standard.

Evensen inserts his penis into [Jane Doe Two's] vagina from behind. She is still asleep and does not move. Evensen has sexual intercourse with [Jane Doe Two]. The video is 13 min. and 32 sec. [Jane Doe Two] never wakes up." (Italics added.)

As stated above, "in a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack." (*Griffin, supra,* 33 Cal.4th at p. 1027.) " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude. [Citation.] It also includes the force used to accomplish 'the penetration and the physical movement and positioning of [the victim's] body in accomplishing the act.' " (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)

In briefing and at oral argument, Evensen cited *People v. Brown* (2017) 11 Cal.App.5th 332 (*Brown*) in support of his argument that when a victim is unconscious, there is " 'no will to overcome' " and thus there can be no forcible rape within the meaning of *Griffin*. *Brown* is distinguishable on its facts. There, the victim was provided intoxicants and then sexually assaulted by a group of men in one location. She was then moved to a second location, where she recalled a man attempting to again assault her before she pushed him away and passed out. (*Id.* at pp. 336–337.) Brown's DNA was found in the victim's vagina and rectum. (*Id.* at p. 337.) The prosecution elected to proceed on the theory that Brown forcibly raped the victim while she was unconscious in the second location. Based on the election, the jury did not receive a unanimity instruction. (*Id.* at pp. 340–342.)

The Fourth Appellate District reversed Brown's forcible rape conviction, finding insufficient evidence of force or fear for the prosecution's

18

elected theory. They described the insufficiency of the evidence as follows: "According to Doe, a man [at the second location] attempted to penetrate her; she pushed him away, then she passed out. If he accomplished a sex act at all, it was after she passed out. Because she was unconscious, there was no need to use force or fear to overcome her will. *Doe could not testify that that man used force, and there was no other evidence of force, such as injuries or the testimony of another eyewitness.* In general, the force inherent in the act of penetration is not sufficient by itself to prove forcible rape." (*Brown, supra*, 11 Cal.App.5th at p. 340, italics added.)

Far from the situation in *Brown,* Evensen recorded the rape of Jane Doe Two and the trial court considered a detailed narration of the video describing the force used. Jane Doe Two viewed the video of the assault underlying count six and confirmed it occurred without her consent. Indeed, Doe Two stated she never had an agreement with Evensen that he could perform sexual acts on her while she was sleeping. Evensen admitted to Dr. Napolitano that he "raped [Jane Doe Two] while she was unconscious" because "he found it more arousing to have sex with her when she was asleep because he preferred to have control over her." Jane Doe Two's statement established that she did not consent to sex while asleep, and Evensen's description of the act as "rape" demonstrates he was aware of her lack of consent. The description of count six establishes that Jane Doe Two did not "positively cooperate" in act or attitude. Evensen used force to reposition Jane Doe Two's body and insert lubricants for the purpose of not waking her, permitting him to accomplish the act of sexual assault against her will by maintaining her unconscious state. We find this evidence of force easily distinguishable from the complete lack of evidence of force in *Brown* and sufficient within the meaning of *Griffin* and *Thomas*, as it was directed at

19

overcoming the victim's will by maintaining her unconsciousness during the sexual act rather than simply facilitating the act of penetration.

In sum, substantial evidence supports the trial court's conclusion that two of Evensen's offenses were accomplished by force, rendering them sexually violent offenses within the meaning of section 6600, subdivision (b).[11]

## B.    *Jury Trial Claims*

Evensen argues that the trial court violated his right to equal protection by failing to obtain a valid personal waiver of his right to a jury trial before proceeding to a court trial.  The Attorney General counters that Evensen has forfeited any equal protection claim and that the trial court did obtain a sufficient jury trial waiver from Evensen.  We find no error.

### 1.    Additional Background

The district attorney filed the initial petition in May 2022, seeking an order returning Evensen to county custody for trial.  Evensen first appeared on the petition via videoconference on June 2, 2022, represented by Deputy Public Defender Kristin Keeley.  Keeley represented Evensen throughout the SVPA proceedings below and had previously represented Evensen at the time of his original convictions.  At a trial setting appearance on October 11, 2023, Keeley appeared on Evensen's behalf and notified the trial court that Evensen intended to enter a waiver of his right to jury trial.  Keeley filed a trial brief on the same day stating that Evensen "will waive his right to a jury trial."  Evensen appeared in open court, in person, for jury trial assignment on October 13, 2023.  The record reflects the following colloquy:

---

[11] Because we have concluded the record supports the trial court's determination that Evensen committed two sexually violent offenses, we do not consider whether any or all of his qualifying offenses could also be deemed sexually violent on other grounds such as duress.

20

"THE COURT:  Back on the record in the Evensen matter.  I will assign this to Judge Boessenecker on Wednesday, October 18.  I understand it is a Court trial.

"[PROSECUTOR]:  We will still need a waiver taken from the Defendant.

"MS. KEELEY:  Yes.  I have indicated to the Court, and I have written in my trial brief, that Mr. Evensen is waiving his right to have a jury decide these issues and he wants a Court trial.  We have discussed it and he wants to waive his right to the jury deciding.

"THE COURT:  Mr. Evensen, did you hear what your attorney said about a court trial versus a jury trial?

"[EVENSEN]:  Yes.

"THE COURT:  Do you understand you have the right to have a jury decide the issue?

"[EVENSEN]:  Yes, Your Honor.

"THE COURT:  Are you willing to give up that right and have a judge decide the issues in the case?

"[EVENSEN]:  I am.

"THE COURT:  I find you waive jury."

Evensen appeared in person for his trial.  In his presence, the trial court and both trial counsel discussed trial procedure, including a pretrial stipulation to admission of exhibit 1 and a waiver of any *Sanchez* objections that might otherwise apply.  During that discussion, defense counsel stated: "[I]f I could just state for the record I did review all of the discovery and all of the cases and spoke to Mr. Evensen about the process.  And since the petition process started, it was very important to him to not traumatize his victims again.  So I think he's grateful to be able to do it in a way where they don't

21

have to come in and testify.  So I talked to him about his choices and he is in agreement to the stipulation that these records are coming in."  Shortly thereafter, defense counsel referenced one perceived advantage of a court trial when discussing defense counsel's objection to the court hearing the experts' legal opinion on whether the offenses qualified as sexually violent:  "And I trust, unlike in a jury trial, where if the doctors rendered opinions, I think a jury would be very impacted.  I don't think a judge would be impacted and would make an independent determination."

Evensen entered no contest pleas at the time of his underlying convictions and completed written waiver of rights forms for each case.  Each of those written waiver forms contained the following language:  "Right To A Trial—I understand that I have the right to a speedy, public jury trial or court trial.  At a trial, I would be presumed innocent, and I could not be convicted unless 12 impartial jurors (or the judge at a court trial) were convinced of my guilt beyond a reasonable doubt."  Evensen hand-initialed each waiver of rights form directly beside this language to indicate his understanding of the right he was waiving.  Defense counsel signed each form consenting to the plea, directly under the following language:  "I am the attorney of record for the defendant.  I have gone over this form, and any attachments, with my client.  I have explained each of the defendant's rights to the defendant and answered all of the defendant's questions about this form and the plea(s).  I have discussed the facts of the case with the defendant and have explained the nature of the charges, the elements of the offense(s), any possible defenses, and the consequences of the plea(s)."

## 2.    Legal Framework and Standard of Review

A person subject to commitment as an SVP has the right to trial by jury.  (Welf. & Inst. Code, § 6603, subd. (a); hereafter section 6603.)  The

22

right to jury trial on an SVP petition is statutory, not constitutional. (*Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 735.) Pursuant to statute, "[i]f the person . . . or the petitioning attorney does not demand a jury trial, the trial shall be before the court without a jury." (§ 6603, subd. (f).) Historically, cases under the SVPA have held that " 'where a jury trial right is merely statutory . . . the right may be waived by counsel.' " (*People v. Rowell* (2005) 133 Cal.App.4th 447, 452 ["Under section 6603, a defendant's right to a jury trial in an SVP proceeding is waived by the simple failure to demand one. There is no requirement that the statutory right to a jury trial be personally waived."].)

More recent cases have entertained equal protection challenges to the lack of a requirement for a personal waiver of jury trial in SVP cases. In *People v. Washington* (2021) 72 Cal.App.5th 453 (*Washington*), Washington declined to be transported from Coalinga State Hospital to court for trial on an SVPA petition filed against him. The trial court arranged for him to appear telephonically and questioned him to confirm that he wanted to waive his right to personally appear. The trial court then conducted a telephonic *Marsden*[12] hearing and denied Washington's request for different counsel. While Washington was still telephonically present, the trial court stated, " '[S]ince there is no demand for a jury trial, the petition will be heard by me without the presence of a jury.' " The trial court then inquired whether both sides agreed. Washington's attorney and the prosecutor both agreed. The trial court did not advise Washington of his right to a jury trial, ask his preference, or take a waiver of the right. (*Washington*, at pp. 460–461.)

On appeal, among other claims, Washington asserted that the trial court's failure to advise him of his right to a jury trial and obtain a valid

---

[12] *People v. Marsden* (1970) 2 Cal.3d 118.

23

waiver violated his right to equal protection, because similarly situated defendants subject to civil commitment under the OMHD (offenders with mental health disorders)[13] and NGI (not guilty by reason of insanity) statutory schemes must affirmatively waive jury trial and no rational basis justifies differential treatment of SVP defendants. (*Washington, supra*, 72 Cal.App.5th at pp. 471–472; compare *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*) [holding OMHD statute requires personal jury trial waiver]; *People v. Tran* (2015) 61 Cal.4th 1160 [holding NGI recommitment requires jury trial advisement and express waiver].) Despite Washington's failure to raise the issue in the trial court, the Second Appellate District found that he had not forfeited the claim because it was "hard to envision how counsel could have asserted this claim" given that "presumably, Washington's attorney believed Washington wanted to proceed with a court trial . . . and thus, counsel would have been unlikely to demand the court advise Washington of his jury trial right and take a personal waiver." (*Washington*, at pp. 473–474.) Based on the inadequacy of the record on appeal, the Second Appellate District remanded the case to the trial court with directions to conduct a hearing on Washington's equal protection claim, observing: "[W]e have difficulty seeing how the dangerousness of an SVP would justify denying an alleged SVP the procedural protections for the right to a jury trial afforded other civil committees, especially given the significant liberty interests at stake for an alleged SVP facing a potential indefinite commitment." (*Id.* at p. 474.)

---

[13] Formerly referred to as mentally disordered offenders, the Legislature has modified the statutory terminology to "offender with a mental health disorder." (§ 2962, subd. (d)(3); *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095, fn. 3.)

Following *Washington*, the Second Appellate District considered a nearly identical equal protection claim in *People v. Magana* (2022) 76 Cal.App.5th 310 (*Magana*). There, Magana appeared by videoconference assisted by a Spanish-speaking interpreter on his SVPA petition. Defense counsel advised the court that neither he nor Magana sought a jury trial. The trial court addressed Magana, explaining, " 'In a court trial, the same burden of proof applies as in a jury trial. [The] court would have to be convinced beyond a reasonable doubt [of] the allegations . . . that are in the petition in order to sustain the petition. [¶] []If the People fail to meet that burden, then the petition would not be sustained, and Mr. Magana would be released. Okay? [¶] []So my understanding, Mr. Magana, is that you agree with your attorney to proceed without a jury trial and have this court hear the matter. Is that correct, Mr. Magana?' " Magana replied in the affirmative. (*Id.* at p. 314.)

The Second Appellate District declined to find that Magana had waived his equal protection argument by failing to assert it in the trial court, noting that Magana's purported jury trial waiver predated the decision in *Washington*, which "for the first time specifically addressed an equal protection challenge to the SVPA's lack of a jury trial advisement." (*Magana, supra*, 76 Cal.App.5th at p. 320.) Although the trial court "advised Magana of the burden of proof in a court trial, the court failed to advise Magana of any of the jury trial rights he would be giving up, including the right to have a trial by a jury of 12 of his peers. And the record is silent as to whether Magana was aware of those rights from his attorney or otherwise." (*Id.* at p. 327.) Thus, the Second Appellate District could not infer from the "silent record" that Magana waived his right to a jury trial knowingly and

intelligently.  (*Ibid.*)  The matter was remanded to the trial court for consideration of Magana's equal protection claim.

Our colleagues in Division Five of this district recently considered this issue in *People v. Cannon* (2022) 85 Cal.App.5th 786, review granted February 5, 2023, S277995 (*Cannon*).  In *Cannon*, defense counsel waived Cannon's right to a jury trial in his absence at a pretrial hearing.  (*Id.* at p. 791.)  The trial court neither advised Cannon of his right to a jury trial nor obtained a waiver.  Cannon's purported waiver occurred in 2018, and his trial and ensuing commitment occurred in 2020 (*ibid.*)—prior to the decisions in *Washington* and *Magana*.  Following the reasoning of *Washington* and *Magana* described above, our colleagues declined to find forfeiture and remanded the matter to the trial court for consideration of Cannon's equal protection claim.  (*Cannon*, at pp. 799, 801.)

In the context of a civil commitment trial, "a trial court's failure to properly advise an [OMHD] defendant of the right to a jury trial does not by itself warrant automatic reversal.  Instead, a trial court's acceptance of a defendant's personal waiver without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary."  (*Blackburn*, *supra*, 61 Cal.4th at p. 1136.)  No valid waiver may be presumed on a silent record.  (*Id.* at p. 1137.)

There is no specifically formulated canvass for a jury trial waiver colloquy.  (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 168.)  The courts "have never insisted that a jury waiver colloquy invariably must discuss jury impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent."  (*Ibid.*)  Offering "general guidance" on ensuring a knowing and intelligent waiver, our Supreme Court has recommended that

26

trial courts advise defendants of "the basic mechanics of a jury trial . . . , including but not limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if the defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Id.* at p. 169.) The Supreme Court further encouraged trial judges to inquire whether a defendant has had an adequate opportunity for discussion with his or her attorney, to ask if counsel has explained the differences between a jury and a bench trial, and to ask a defendant directly if he or she has any questions. (*Id.* at pp. 169–170.) The guidance described above was "advisory," and "not intended to limit trial courts to a narrow or rigid colloquy." (*Id.* at p. 170.) In assessing the totality of the record to determine if a waiver is knowing and intelligent, a reviewing court may consider the defendant's representation by counsel, the extent to which the record reflects discussion between counsel and the defendant, and the defendant's prior experience with the justice system. (*People v. McCray* (2023) 98 Cal.App.5th 260, 275–277.)

### 3. Equal Protection Argument Forfeited

Evensen concedes that he made no equal protection argument in the trial court. He nevertheless urges us to reach the merits by finding that the challenge raises a pure question of law, and he had no opportunity to bring it below as in *Washington*, *Magana*, and *Cannon*. Because we find that Evensen could have brought his challenge in the trial court, we conclude he has forfeited his equal protection claim.

An equal protection claim may be forfeited by failure to assert it in the trial court. (*Magana, supra,* 76 Cal.App.5th at pp. 319–320, citing *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14; *People v. Rogers* (2006)

27

39 Cal.4th 826, 854; *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1447.) In *Washington*, *Magana*, and *Cannon*, the court exercised discretion to consider arguably forfeited claims because the procedural posture of each case demonstrated that the defendant had no opportunity to raise the challenge in the trial court. *Washington* was the first post-*Blackburn* case to consider an equal protection challenge to the jury trial waiver provision in an SVP petition. According to the appellate court, expecting Washington's counsel to object to the trial court's failure to take a jury trial waiver would have " ' " ' " 'place[d] an unreasonable burden . . . to anticipate unforeseen changes in the law.' " ' " ' " (*Magana, supra,* 76 Cal.App.5th at p. 320.) Similarly, Magana's and Cannon's SVP trials both took place before *Washington* was decided. At the time of the inadequate waiver colloquies, their attorneys could not have been expected to anticipate *Washington*'s articulation of a basis for an equal protection challenge.

By contrast, Evensen's SVP trial took place in October 2023—nearly two years after the decision in *Washington*, 19 months after the decision in *Magana*, and 11 months after the decision in *Cannon*. The framework for Evensen's equal protection challenge to section 6603's lack of requirement for a personal jury trial waiver was well established by the time of his trial. Had he wished to assert his entitlement to a more robust personal jury trial waiver, he or his counsel could have done so. Instead, his counsel filed a brief in advance of trial stating that Evensen would waive a jury. In open court and at the prompting of the prosecutor, Evensen's counsel repeated in his presence that she had discussed the waiver with him and that he wished to waive a jury trial. The trial court addressed Evensen directly to confirm that he understood what his counsel had said, and he stated that he did. The trial court confirmed that Evensen understood that he had the right to a jury trial.

The trial court then asked Evensen if he agreed that he wished to have a judge decide rather than a jury. Evensen affirmed that he was willing to waive the right to a jury trial. The waiver occurred five days prior to the commencement of trial. Evensen never objected to the lack of a jury after the initial waiver.

### 4. Record Affirmatively Shows Sufficient Jury Trial Waiver

Even had we concluded that Evensen did not forfeit his equal protection claim, we would still deny his request for remand to further develop it because the totality of the record demonstrates a knowing, intelligent waiver of the right to a jury trial. Evensen was represented by the same counsel during the criminal proceedings that led to his convictions and his SVP proceedings. At the time of his jury trial waiver, defense counsel had represented Evensen continuously for 16 months. Evensen's counsel discussed his right to a jury trial in advance of the waiver colloquy, as indicated by her written trial brief requesting a court trial and her statement in open court at the time of the colloquy. At the colloquy, the trial court addressed Evensen personally and confirmed that he understood his counsel's statement that they had talked and that he wanted a court trial. The trial court confirmed that Evensen understood he had the right to a jury trial, and that he knew that waiving it meant a judge would decide his case. During the court trial and in Evensen's presence, Evensen's counsel expressed that she had reviewed "all of the discovery and all of the cases and spoke to Mr. Evensen about the process," and further articulated a strategic reason for the choice of a court trial—that a judge would be less "impacted" by expert opinion about whether the offenses were sexually violent and thus more likely to make an "independent determination" of that question. Evensen had prior experience with jury trial waivers and had previously been advised

29

in writing that at a jury trial, he "could not be convicted unless 12 impartial jurors (or the judge at a court trial) were convinced of my guilt beyond a reasonable doubt." He personally initialed the plea forms indicating his understanding of the nature of a jury trial directly beside the quoted language.

Evensen's case is readily distinguishable from *Washington*, where the trial court never addressed Washington to determine if he wanted a jury trial. It is similarly distinguishable from *Cannon*, where Cannon was absent from the courtroom when counsel waived jury on his behalf. Although the trial court's on-the-record colloquy with Evensen bears some similarity to that in *Magana*, this record is not "silent" about Evensen's awareness that a jury trial includes the right to a unanimous decision by 12 impartial jurors—he had previously been provided with a written description of those rights, discussed them with the same counsel who represented him in the SVP proceedings, and waived them in writing. Evensen's case does not resemble others where jury trial waivers were found to be inadequate because counsel was appointed only "moments" before the entry of a barebones waiver, or the record did not indicate any basis for believing that the defendant had discussed the nature of the jury trial right with counsel prior to the waiver. (*People v. Blancett* (2017) 15 Cal.App.5th 1200, 1206; *People v. Jones* (2018) 26 Cal.App.5th 420, 434.)

### III. DISPOSITION

The judgment is affirmed.

HILL, J.*



WE CONCUR:



HUMES, P. J.



BANKE, J.













A169158
*People v. Evensen*

---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31